Caroline CHURCH, et al., Plaintiffs

v.

GENERAL ELECTRIC COMPANY,
Defendant

No. CIV. A. 95–30139MAP.

United States District Court,
D. Massachusetts.

March 30, 2001.

Cristobal Bonifaz, John Bonifaz, Amherst, MA, Martin J. D'Urso, Michael J. Boni, Joseph C. Kohn, Neil L. Glazer, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Caroline Church, Dorothy Cohen, Thomas Ferguson, Frances Ferguson, Margaret Lewis, Abby Kramer Mayou, Gerald Reder, Patricia Reder, Gwendolyn Sears, Tim Smith, Nancy Smith, Mildred L. Zimmerman Trust, the, individually and on behalf of all others similarly situated, Plaintiffs.

Paul F. Ware, Jr., James W. McGarry, Gregory A. Bibler, Dana L. McAlister, Goodwin Procter LLP, Boston, MA, Robert J. Shaughnessy, Steven R. Kuney, Williams & Connolly, Washington, DC, for General Electric Company, Defendant.

John D. Beling, Assist. Atty. Gen., Environmental protection Div., Boston, MA, for Commonwealth of Mass., movant.

## MEMORANDUM REGARDING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

PONSOR, District Judge.

(Docket Nos. 164 and 159)

### I. INTRODUCTION

In this diversity action, plaintiffs seek damages and injunctive relief against

General Electric Company ("GE") for the contamination of their lands with polychlorinated biphenyls ("PCBs"), a probable human carcinogen. The named plaintiffs own properties in Pittsfield and Lenox, Massachusetts that lie within the floodplain of the Housatonic River. They allege that for many years General Electric dumped waste containing PCBs into the land surrounding its plant in Pittsfield, and that the contaminants continue to seep from GE's land into the river and thence downstream onto plaintiffs' properties. Defendant seeks summary judgment on all counts of plaintiffs' complaint, while plaintiffs seek certification of a class to assert claims for property devaluation and injunctive relief against General Electric.

The court is not unfamiliar with this controversy, for this is the second motion for summary judgment that has been briefed in this nearly six-year-old case. In March of 1997, the court held that plaintiffs' claims were time-barred with respect to damage that occurred before July 1992, but allowed plaintiffs to proceed to the extent they could show that actionable conduct after July 1992 has caused continued deposits of PCBs onto their properties. *See* Memorandum Regarding Defendant's Motion for Summary Judgment, Docket No. 60. Pursuant to Fed.R.Civ.P. 56(d), the court deferred its ruling to allow facts and arguments regarding the "continuing tort" concept to be developed. *Id.*

Now, after more extensive discovery, defendant moves again for summary judgment, averring that plaintiffs' claims fail as a matter of law, and in the alternative that they have not produced sufficient evidence of a continuing nuisance or trespass to survive summary judgment. Plaintiffs oppose the motion, and seek certification of a class made up of residential land owners in the Housatonic floodplain to recover for property devaluation caused by the continuing nuisance and trespass.

The court will allow defendant's motion in part and deny it in part. Summary judgment will be allowed on the counts of the complaint alleging negligence, strict liability, and violation of the Massachusetts Oil and Hazardous Waste Release Prevention Act, Mass. Gen. Laws ch. 21E. Plaintiffs have, however, demonstrated enough in the way of actionable conduct and continued harm within the limitations period to sustain their claims for continuing nuisance and trespass. Plaintiffs' motion for class certification will be denied because the individual issues posed in this matter are not sufficiently outweighed by common issues to make this case suitable for class certification under Fed.R.Civ.P. 23(b)(3).

## II. *BACKGROUND*

### A. *PCBs in the Housatonic*

The Housatonic River begins at a small pond in the town of Washington in the northern reaches of Berkshire County, the westernmost county of Massachusetts. The river runs south nearly the width of the state, dividing the county lengthwise. Apart from the Berkshire mountain range, the rolling hills for which the county is named, the Housatonic River is the central feature of the region, one long known for its spectacular natural beauty. In 1835, Frances Anne Kemble, a celebrated English actress and early Berkshire personality, described the setting:

A "Happy Valley" indeed!—The Valley of the Housatonic, locked in by walls of every shape and size, from grassy knolls to bold basaltic cliffs. A beautiful little river wanders singing from side to side in this secluded Paradise, and from every mountain cleft come running crystal springs to join it; it looks only fit for people to be baptized in (though I be-

lieve the water is used for cooking and washing purposes).

Frances Anne Kemble, Letter, 1835, excerpted in THE BERKSHIRE READER 145 (Richard Nunley, ed., 1992).

In 1903, the General Electric Company began manufacturing electrical transformers in a plant on the banks of the Housatonic in Pittsfield, Massachusetts. The Pittsfield plant soon became the world's largest transformer factory, employing over 10,000 workers in 1950. By the 1960s, the plant had swelled to include naval ordinance, tank transmission assembly, and plastics manufacturing plants in addition to its transformer facility, and the payroll had increased to about 14,000. "The influence of G.E. in Pittsfield," noted the Saturday Evening Post in 1950, "is immense," and the plant is the force "on which, in the main, the city's prosperity depends." Henry F. Pringle & Katharine Pringle, *The Cities of America: Pittsfield, Mass.*, SATURDAY EVENING POST, Apr. 29, 1950, at 40.

In 1932, General Electric developed and started using a chemical called Pyranol as an insulating agent in its transformers. Pyranol was made from PCBs, now considered a human carcinogen. The chemicals are linked to skin cancer, liver cancer, brain cancer, intestinal cancer, bladder cancer, leukemia, birth defects in humans and animals, and other health problems. *See Estate of Sarocco v. General Elec. Co.*, 939 F.Supp. 91, 94 (D.Mass.1996); JOHN HARTE ET AL., TOXICS A TO Z 383 (1991). Humans can absorb the chemicals through skin contact, inhalation or ingestion. *Id.* One of the chief dangers of PCBs is their durability—they are resistant to breakdown and therefore tend to remain in the environment and in living tissue longer than other toxins. Although the possible toxic effects of PCBs were known as early as the 1930s, the chemicals were not highly regulated until 1977, when Congress passed the Toxic Substances Control Act, 15 U.S.C. § 2605(e) (prohibiting, *inter alia*, manufacture of products containing PCBs except in "totally enclosed manner").

As the health risks of PCBs became apparent, the city of Pittsfield began to realize that years of waste disposal practices by GE had contaminated the company's site with PCBs. Through at least the 1960s, General Electric dumped waste oil containing PCBs into the land around its plant and into the Housatonic River. The contamination began to cause grave health concerns among the people of Pittsfield. As early as 1971, the Berkshire Eagle reported that Pyranol was a potential health hazard, and that "leakage from GE's old underground oil system [had] saturated the ground and was a major cause of pollution to the Housatonic River. Some of that leakage was Pyranol...." Richard K. Weil, *Health Peril Seen in GE Transformer Oil*, BERKSHIRE EAGLE, Sept. 23, 1971, at 1.

The contamination of Pittsfield and the Housatonic also began to spawn litigation, in this court and elsewhere. The first lawsuit regarding PCBs in the Housatonic River was filed in 1977, in the U.S. District Court in Connecticut. *See Housatonic River v. General Elec. Co.*, 462 F.Supp. 710 (D.Conn.1978). A second action, one much like the instant case, was filed in 1979 by riverbank landowners in Connecticut, seeking damages in nuisance and trespass for property devaluation. *See Ruland v. General Elec. Co.*, 94 F.R.D. 164 (D.Conn.1982).

State governments and regulatory agencies soon intervened, as well. In 1981, GE entered into a consent order with the Massachusetts Department of Environmental Quality Engineering to ensure its cooperation in the further study of the PCB problem. Delays, however, prevented the allo-

cation of significant resources for cleaning up the Housatonic until September 24, 1998, when General Electric, the EPA, and the states of Massachusetts and Connecticut agreed in principle to a massive joint remediation effort on the river. On October 27, 2000, this court entered a consent decree between GE, the United States, and the states of Massachusetts and Connecticut that launched a $300 to $700 million cleanup effort, the bulk of which will be paid for by General Electric.

### B. *Background of this Case*

Plaintiffs filed this action on July 3, 1995. The plaintiffs, landowners in Pittsfield and Lenox, Massachusetts, allege that PCBs released from the General Electric plant in Pittsfield have contaminated the Housatonic River and then washed up onto their properties, causing the properties to lose value. Early in the case, pursuant to counsel's request, the court addressed defendant's statute of limitations defense on an expedited basis after limited discovery. In 1997, the court held that plaintiffs could not recover for any damage sustained prior to three years before the date of suit, July 3, 1992. Any reasonable person in plaintiffs' position, the court held, would have known of the contamination of the Housatonic River and its likely source prior to July 3, 1992. However, the court held that facts and arguments remained to be developed as to whether plaintiffs could establish a continuing tort. *See* Memorandum Regarding Defendant's Motion for Summary Judgment, Docket No. 60, at 10–13. Now, after more extensive discovery, defendant moves for summary judgment again, arguing that plaintiffs' claims fail as a matter of law, and in the alternative, that plaintiffs have failed to produce enough evidence of a continuing tort to survive summary judgment. Defendant also attempts to remove named plaintiffs Sears and Zimmerman for lack of standing, and

seek to exclude plaintiff's expert, James F. O'Connor.

Plaintiffs' motion for class certification is their third in this case. The first two were denied without prejudice on the ground that, because of the particular facts and issues in this case, the motions could not be addressed prior to discovery.

### III. *DISCUSSION*

### A. *Defendant's Motion for Summary Judgment.*

The court will treat each of defendant's arguments for summary judgment in turn. Summary judgment may only be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue exists for trial, the court must view facts, and inferences from facts, in the light most favorable to the plaintiff. *See Diaz v. City of Fitchburg,* 176 F.3d 560, 561 (1st Cir.1999).

### 1. *Negligence, Strict Liability and Statutory Claims.*

■ In 1997, the court allowed plaintiffs' claims to overcome a limitations challenge only to the extent they could demonstrate a continuing nuisance or trespass. The long-recognized concept of continuing nuisance or trespass allows a plaintiff whose claim otherwise would not be timely to sue where his or her property rights are invaded from time to time because of repeated or recurring wrongs. *See Carpenter v. Texaco,* 419 Mass. 581, 583, 646 N.E.2d 398 (1995). For example, the continued maintenance of defective gutters or culverts that periodically cause the flooding of adjacent property has been found to

constitute a continuing nuisance, such that the limitations clock will begin to run at each flooding event. *See, e.g., Sixty–Eight Devonshire, Inc. v. Shapiro,* 348 Mass. 177, 183–84, 202 N.E.2d 811 (1964) (faulty gutter that dumped water on plaintiff's roof); *Wells v. New Haven & Northampton Co.,* 151 Mass. 46, 49–50, 23 N.E. 724 (1890) (culvert that released water of eight natural streams onto plaintiff's property); *Murphy v. Town of Chatham,* 41 Mass. App.Ct. ·821, 823, 676 N.E.2d 473 (1996) (blocked culvert that repeatedly flooded adjacent cranberry bog).

General Electric contends that the court's 1997 ruling necessarily disposes of plaintiff's negligence and strict liability counts, as well as their claim under Mass. Gen. Laws ch. 21E, because those actions are not subject to the continuing tort exception to the statute of limitations. Defendant claims, and plaintiffs do not dispute, that the only continuing torts recognized in Massachusetts are nuisance and trespass. *See Boothroyd Dewhurst, Inc. v. Poli,* 783 F.Supp. 670, 699–700 (D.Mass.1991) (declining to extend continuing tort doctrine beyond nuisance and trespass).

Plaintiffs essentially concede this point, except on the statutory claim, which plaintiffs argue is timely. Ordinarily, claims for property damage under Mass. Gen. Laws ch. 21E are brought under section 5, and are subject a three-year statute of limitations. *See* Mass. Gen. Laws ch. 21E §§ 5, 11A(4). Plaintiffs, however, contend that this case falls under section 4A of the statute, which regards suits for "contribution, reimbursement or an equitable share of the costs" of a response action taken to remediate contamination. Mass. Gen. Laws ch. 21E § 4A. Section 4A gives standing to "any person … who has undertaken, is undertaking, or intends to undertake a necessary and appropriate response action," and allows a claimant to start the limitations clock running by sending a notice letter to other parties responsible for the presence of contaminants. *Id.* Sending a notice letter under § 4A is one of a list of ways in which its three-year statute of limitations may accrue. *See* Mass. Gen. Laws ch. 21E § 11A(2). If the parties cannot apportion responsibility for the pollution through settlement, the party seeking costs may commence a civil action within three years of sending the letter.

■ Unfortunately for plaintiffs, this lawsuit has never been about "contribution, reimbursement or equitable share" under § 4A. Mass. Gen. Laws. ch. 21E § 4A(a). Although plaintiffs did send a letter to the CEO of General Electric purporting to give notice of a § 4A claim, it was deficient in a number of respects. *See* Plaintiffs' Exhibit 41, Docket No. 183. Nowhere in the letter, for example, did plaintiffs "identify and describe the response action that has been, is being, or is intended to be undertaken" or outline its cost as required by the statute.[1] Mass.

---

1. The statute lists a number of particularized requirements that a notice letter, if sent, must meet. The letter

shall (i) identify the person giving the notice and the relationship of that person to the site or vessel, (ii) identify and describe the response action that has been, is being, or is intended to be undertaken, including the expected cost and the duration of the response action, and the nature and amount of actual or potential liability pursuant to the provisions of this chapter, (iii) describe with particularity the legal and factual basis for the notifier's claim that the person to whom the notice is being sent is liable pursuant to section five, and (iv) state said person's proposed contribution, reimbursement or equitable share of such liability pursuant to this section and rationale for such proposal.

Mass. Gen. Laws ch. 21E § 4A(a).

Gen. Laws ch. 21E § 4A(a). Indeed, plaintiffs have never expressed any intent to spend any money to remediate their lands; rather, they assign full responsibility to General Electric and assert that it should both remediate the properties and pay damages to plaintiffs in the amount the properties were devaluated.

That this is truly an action for property damage under § 5 is further betrayed by the text of plaintiffs' First Amended Class Action Complaint. Count Ten, despite language referring to § 4A, seeks damages under § 5(a)(iii), the provision relating to claims for property damage. *See* Plaintiffs' First Amended Class Action Complaint, Docket No. 80 at 28. Even more telling, nowhere in plaintiffs' statement of damages do they seek contribution, reimbursement or an equitable share of the costs of a response action under the damages provision for § 4A. *See* Plaintiffs' First Amended Class Action Complaint, Docket No. 80 at 28–29. Rather, they ask for abatement, compensatory damages, and costs—relief more appropriate to a property damage action. *See id.*

Accordingly, the court will treat Count Ten as an action under § 5 of Mass. Gen. Laws ch. 21E. Plaintiffs do not dispute, (nor could they), that chapter 21E § 5 claims are not subject to the "continuing tort" exception to the statute of limitations; the legislature expressly rejected including the exception in the statute. *See Carpenter*, 419 Mass. at 583–84, 646 N.E.2d 398. As such, the claim is barred by the statute of limitations pursuant to the court's prior ruling. *See* Memorandum Regarding Defendant's Motion for Summary Judgment, Docket No. 60, at 12.

The court will allow summary judgment on the claim under Mass. Gen. Laws ch. 21E, as well as the counts alleging negligence and strict liability.

2. *Continuing Nuisance and Trespass.*

■ Next, defendant argues that the nuisance and trespass claims are time-barred because plaintiffs allege a permanent harm, not a temporary harm, and therefore cannot obtain the protection of the "continuing tort" exception to the statute of limitations. *Carpenter*, 419 Mass. at 583–84, 646 N.E.2d 398. Defendant asserts that a plaintiff cannot make out a claim for a continuing nuisance or trespass unless the nuisance is of a temporary nature, and therefore can be easily abated. *See* Defendant's Memorandum in Support, Docket No. 165 at 5, *citing Aetna Cas. & Sur. Co. v. Gulf Resources & Chem. Corp.*, 600 F.Supp. 797, 801 (D.Idaho 1985). Plaintiffs argue that there is no support for such a rule in Massachusetts case law, and that the cases from other jurisdictions on which defendant relies do not support it either.

Both logic and persuasive authority demonstrate that plaintiffs are correct. It seems obvious that a continuing trespass can cause temporary harm, permanent harm, or both. It is an odd suggestion that, because the injury is permanent, the misconduct that has caused it cannot be ongoing. The Supreme Court of Utah has put it succinctly:

Whether the trespass or nuisance is continuous or permanent is a different question from whether the resulting injury to the land or to the possessor's interests in the land is temporary or

While it is not clear to what extent an otherwise meritorious claim under § 4A would be barred for failure to give proper notice in the letter, plaintiffs' failure to meet the requirements here demonstrates that, put-

ting the label aside, the gravamen of plaintiffs' claim is under § 5, not § 4A. *See Rudnick v. Hospital Mortg. Group Inc.*, 951 F.Supp. 7, 9 (D.Mass.1996) (noting ambiguities in notice provision of § 4A).

permanent.... A continuing trespass or nuisance ... may cause either a permanent or temporary injury.

*Walker Drug Co., Inc. v. La Sal Oil Co.,* 972 P.2d 1238, 1246 n. 9 (Utah 1998). Though defendant points to a few cases which make passing reference to "permanent" versus "temporary" nuisances, the most recent Massachusetts authority on point suggests that the Supreme Judicial Court would allow a claim for continuing trespass to stand whatever the nature of the harm. In *Carpenter,* the court held that the mere continued presence of gasoline on plaintiff's land would not give rise to a continuing tort, but suggested that if gasoline had seeped on to the plaintiff's properties during the limitations period, that "would present a different case." *Carpenter,* 419 Mass. at 583 n. 5, 646 N.E.2d 398. The gasoline contamination is no less "permanent" a harm than the PCB contamination alleged here, which plaintiffs allege continues to be caused, even as this memorandum is written, from ongoing seepage off defendant's property. Thus, plaintiffs will not be denied the protection of the continuing tort doctrine on this score.

### 3. Standing of Condominium Unit Owners.

■ Before the court reaches the question of whether sufficient facts have been shown for plaintiffs to survive summary judgment, there is one more satellite issue. Defendant again moves for summary judgment against named plaintiffs Gwendolyn Sears and Mildred Zimmerman, unit owners in the Orchards Condominium on Appleton Avenue in Pittsfield. In 1997, defendant moved for summary judgment against these plaintiffs on the ground that under Massachusetts law and the plaintiffs' condominium agreement, only the trustees of the condominium may bring actions regarding the common areas of condominium property. Mass. Gen. Laws ch. 183A § 10(b)(4). Because Sears and Zimmerman complain only of damage to common areas, defendant argued, they lacked standing to sue. The court held that it would allow Sears and Zimmerman to proceed with the other named plaintiffs so far as the continuing tort theory could take them, noting that 1) the facts were not clear whether Sears and Zimmerman were asserting damage to their units or to the common area, and 2) the law was not clear "whether an owner of a unit may bring a lawsuit for diminution of value *to the unit itself* based upon damage to the common areas." Memorandum Regarding Defendant's Motion for Summary Judgment, Docket No. 60 at 14 (emphasis in original).

Discovery, defendant says, has now made clear that Sears and Zimmerman are only alleging contamination of the common areas, not of their units. *See* Def. Ex. 14, Docket No. 167 (Sears Dep.) at 72; Def. Ex. 15, Docket No. 15 (Zimmerman Dep.) at 71–72 (Sears and Zimmerman stating at deposition that they do not allege contamination of the units themselves). Plaintiffs' argument now, they say, "is just a quarrel with settled Massachusetts law" on the standing of unit owners. Reply in Support of Defendant's Motion, Docket No. 187 at 8. Contrary to defendant's suggestion, however, Massachusetts case law is no more settled on this issue than it was four years ago.

The statute grants to the condominium association the exclusive power to "conduct litigation and to be subject to suit as to any course of action involving the common areas and facilities...." Mass. Gen. Laws ch. 183A § 10(b)(4). This provision has been held to grant exclusive standing to the association to sue, for example, over negligent construction of the common areas. *See Cigal v. Leader,* 408 Mass. 212,

217, 557 N.E.2d 1119 (1990). Allowing Sears and Zimmerman to go forward, defendant argues, would undermine this authority because any damage to a common area usually devalues individual units.

■ An association's authority, however, has always been tempered by the fact that it may "act only for the benefit of all the unit owners." *Glickman v. Brown,* 21 Mass.App.Ct. 229, 236, 486 N.E.2d 737 (1985). It does not have authority to litigate "the particular claim of an individual unit owner." *Golub v. Milpo,* 402 Mass. 397, 401, 522 N.E.2d 954 (1988). Therefore, in cases in which a condition on a common area harms only one unit, unit owners have had standing to sue regarding the common area. *See Golub,* 402 Mass. at 403, 522 N.E.2d 954 (allowing unit owner to sue over a common area, a leaky roof, which damaged her unit, despite condominium association's grant to developer of a release of claims concerning roof); *McEneaney v. Chestnut Hill Realty Corp.,* 38 Mass.App.Ct. 573, 577, 650 N.E.2d 93 (1995) (allowing unit owner to sue condominium trust over noisy air conditioner in common area as private nuisance, treating unit and common area as adjacent parcels of land).

Although there is no evidence that Sears and Zimmerman are the only unit owners who have been harmed by the contamination, their claims are nonetheless "particular" to them: they seek only compensation for the devaluation of their units. *Golub,* 402 Mass. at 403, 522 N.E.2d 954. The court is unaware of any Massachusetts case denying a plaintiff this kind of relief. While the issue is not crystal clear, ch. 183A does not appear to bar Sears and Zimmerman from suing for damage suffered by them individually; it is hard to

see how their doing so will in any way interfere with the prerogatives of the condominium association.[2] Sears and Zimmerman will therefore be allowed to proceed.

### 4. *Sufficiency of the Record.*

■ The court will now address whether plaintiffs have produced enough evidence to survive summary judgment on their claims of continuing nuisance and trespass. The parties agree that plaintiffs' burden is to show 1) continued harmful deposits of PCBs onto their properties during the limitations period, and 2) GE's recurring tortious conduct within the limitations period which caused the PCBs to arrive on plaintiffs' lands. *See Carpenter,* 419 Mass. at 583, 646 N.E.2d 398 (holding that "a continuing trespass or nuisance must be based on recurring tortious or unlawful conduct and is not established by the continuation of harm caused by previous but terminated tortious or unlawful conduct").

Defendant argues that the claims of continuing nuisance and trespass fail because even if plaintiffs could show continued harm of sufficient magnitude, which defendant disputes, they cannot show that the deposited PCBs came from a source under GE's control, much less that they came from continued actionable conduct by GE. Counsel at oral argument noted that plaintiffs' main claim of continued conduct is GE's failure to clean up its property to the extent plaintiffs would like. Defendant denies that this is enough "conduct" to overcome summary judgment. As for continued harm, defendant complains that plaintiffs' expert environmental engineer, Joel S. Loitherstein, has not rendered an

---

**2.** It is conceivable that if abatement of the nuisance requires digging up the riverbank, other condominium unit owners may be entitled to be heard. This question, if it should emerge, may await the remedy phase.

opinion as to exactly where on GE's land the PCBs came from, how they traveled a mile or more to plaintiffs' properties, when they arrived, or what course they took. Without this information, defendant argues, plaintiffs cannot satisfy the requirements of a continuing tort.

Plaintiffs point primarily to Loitherstein's reports, and to facts determined by the EPA, to meet their burden. As for continued seepage, Loitherstein has submitted a lengthy report and a sworn affidavit stating that in his opinion, PCBs continue to seep out of GE's land into the river. *See* Pl.Ex. 14, Docket No. 182 (Loitherstein Report); Pl.Ex. 48, Docket No. 183 (Loitherstein Aff.). As a basis for this opinion, he notes that PCB particles collected by the EPA from the river in the Spring of 1998 were "unweathered," indicating that they came from a "reasonably fresh release." Def. Ex. 11, Docket No. 167 (Loitherstein Dep.) at 13. This leads Loitherstein to believe that the PCBs came "from soil particles, erosion of some sort, most likely from the riverbanks." *Id.* at 20. Defendant controls most of the contaminated riverbanks upstream of where the tests were taken, and is responsible for a number of areas of the floodplain where the EPA has found a threat of release. It is therefore Loitherstein's opinion that "the dominant source of PCBs to the Housatonic River's floodplain properties is ... an ongoing source that is discharging unaltered PCBs from properties owned by General Electric." Pl.Ex. 14, Docket No. 182 at 22.

Plaintiffs also point to the continued arrival of PCBs on plaintiffs' properties after July, 1992. Although defendant does not dispute that PCBs in some degree continue to wash up on plaintiffs' riverbanks, it asserts that it is just as likely that these PCBs came from river sediment in areas of the river not under GE's control as from

riverbanks owned by GE. Loitherstein, however, has a different opinion: in his affidavit of February 15, 2001, he claims that PCBs found on plaintiffs' properties after a flood on June 7, 2000, had apparently "been in the environment a relatively short time" because they were not mixed with the total organic compound ("TOC") of the river. Pl.Ex. 48, Docket No. 183 at 3. This, he says, tends to show that the PCBs came not from river sediment, but from riverbanks. *Id.* Loitherstein made similar findings as to the PCBs found in the Spring of 1998, and believes that both samples are indicative of the state of the PCBs continuing to wash up onto plaintiffs' properties. *Id.* at 20; Pl.Ex. 48, Docket No. 183 at 3.

Defendant suggests that to overcome the Rule 56 inquiry, plaintiffs must, in essence, date and time-stamp each PCB molecule released from GE's property, then track its course onto plaintiffs' lands. This misapprehends the standard of review on summary judgment. Viewing the evidence in the light most favorable to plaintiffs, there is enough circumstantial evidence for a jury to draw a reasonable inference that ongoing seepage from GE's land continues to pollute the river and cause harm to plaintiffs' properties.

Plaintiffs have also alleged enough actionable conduct to meet the standard enunciated in *Carpenter,* 419 Mass. at 583, 646 N.E.2d 398. Loitherstein states that in his opinion as an environmental engineer, GE has not taken adequate steps to remediate its own lands to prevent the continuing release of PCBs into the Housatonic. *See* Pl.Ex. 14, Docket No. 182. For example, Loitherstein notes that the first step in remediating underground contamination is to identify the source and extent of underground plumes of contaminants. *Id.* at 7. Yet, he says, "The number of subsurface explorations performed by

General Electric to characterize the extent and identify sources of contamination is woefully inadequate." *Id.* at 6. Known plumes have remained unexplored, and even imminent hazards remain to be identified. *Id.* at 6–7. Additionally, it is Loitherstein's opinion that General Electric has taken relatively few steps in accordance with industry standards to remediate sources of PCB contamination. For example, with regard to one known plume, at a site called "East Street 2," Loitherstein estimates that at GE's current rate of removal, the plume will exist for another 825 years. For another site, called "Building 68," General Electric has installed sheet piling to prevent oils from seeping into the river. However, Loitherstein claims that his dye tests show the piling to be permeable. It therefore "offers no protection to the River." *Id.* at 18.

If, as plaintiffs have alleged, defendant has failed to remediate its own lands in a manner reasonably consistent with industry standards to stop known continued leakage of PCBs into the Housatonic River, *Carpenter* suggests that General Electric could be found to be maintaining a nuisance. *See Carpenter,* 419 Mass. at 583 n. 5, 646 N.E.2d 398. General Electric is in substantially the same position as defendants in cases regarding the continued presence of a defective gutter, *see Sixty–Eight Devonshire, Inc. v. Shapiro,* 348 Mass. 177, 183–84, 202 N.E.2d 811 (1964), or faulty culverts or dams resulting in flooding. *See Murphy v. Town of Chatham,* 41 Mass.App.Ct. 821, 823, 676 N.E.2d 473 (1996); *Wells v. New Haven & Northampton Co.,* 151 Mass. 46, 49–50, 23 N.E. 724 (1890); *Prentiss v. Wood,* 132 Mass. 486, 489 (1882).

Apart from defendant's failure to remediate its lands, plaintiffs also allege that GE withheld information from regulators on potential threats of release, specifically with respect to Building 68, a structure lying on the banks of the Housatonic. According to plaintiffs, defendant knew as early as 1981 that a 5,000 gallon dump of Pyranol had occurred there in 1968, but did not reveal the information until 1997 after the media broke the story. Defendant had been under a duty to reveal such information to regulators since 1981 pursuant the consent order with the state. Testing in 1997 found higher than expected levels of PCB contamination in the river and banks nearby Building 68—some spots registered up to 120,000 parts per million PCBs. A jury could find that this conduct contributed to the maintenance of a nuisance during the limitations period.

In sum, there is a material issue of disputed fact as to defendant's continued contamination of the Housatonic River and the harm to plaintiffs' properties. Summary judgment will therefore be denied as to the nuisance and trespass claims.

### 5. *Proof of Damages.*

Finally, GE contends that summary judgment should be granted because plaintiffs have not produced any competent evidence of property damage. Defendant seeks by separate motion to exclude the testimony of plaintiff's damages expert, James F. O'Connor. O'Connor would testify, if permitted, about a "research project" he conducted on the effect of PCBs on the value of residential properties in the Housatonic floodplain. *See* Plaintiffs' Memorandum Opposing Defendant's Motion to Exclude, Docket No. 185, Ex. A (O'Connor Report) at 1. He calculated, on a class-wide basis, what he considers to be the median diminution of value for an average single-family dwelling in the Housatonic floodplain attributable to PCB contamination—a reduction of 25 percent. O'Connor arrived at this figure by hypothesizing that the "maximum damage" ·from

environmental contamination was the difference between the median value of all houses and the value of the median of the lowest decile of the housing values in the community. Defendant's Motion to Exclude, Docket No. 170, Ex. 2 (O'Connor Dep.) at 71–72. That figure worked out to be a 50% reduction. But this seemed too high to Mr. O'Connor, since most houses in the flood plain continue to be habitable, so he reduced the figure to the midpoint: 25 percent. *See id.*

Defendant attacks this testimony as irrelevant to this case, unhelpful to the jury, and unreliable as a matter of law. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Fed.R.Evid. 702. As to relevance, defendant claims that O'Connor's calculations do not relate to any recognizable concept of market value; rather, they concern a "market response" O'Connor has discovered that "is just beginning to be felt," and which therefore cannot be translated into actual damages in this case. Defendant's Memorandum in Support, Docket No. 170, at 5–6. O'Connor's concept of the "median property" also has no bearing on the issues of this case, defendant says, because he admittedly cannot apply it to any actual property in the floodplain of the Housatonic. *Id.* at 6. Some properties may be devalued less than 25%, others by a higher figure. *Id.* With respect to reliability, defendant attacks O'Connor's methodology at reaching the 25% devaluation figure, which, defendant says, simply has no reliable connection to PCB contamination. Defendant asserts that there is no principled basis for reaching the figure other than O'Connor's claim that it comports with "common sense," and it therefore fails the Supreme Court's requirement that an expert opinion be marked by "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," real estate appraisal. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Defendant's Memorandum in Support, Docket No. 170 at 19.

Although the reliability of O'Connor's methodology and the relevance of his testimony appear doubtful, it is too soon to render a ruling on the motion to exclude. Significantly, there seems to be no principled basis for believing that the 25% devaluation figure has anything to do with PCB contamination. It is also doubtful that it would be fair to either party to charge defendant for 25% of the real estate value of all the residences in the floodplain regardless of the extent of the actual contamination on those properties. Although individual appraisal seems the better way to measure the property damages, the court will defer its judgment until a *Daubert* hearing may be held. The motion to exclude O'Connor and the corresponding motion for summary judgment for failure to prove damages will therefore be denied without prejudice.[3]

## B. *Plaintiffs' Motion for Class Certification.*

■ Finally, the court will address plaintiffs' motion for class certification. Plaintiffs' proposed class would include

All persons in this judicial district who currently own, or at any time since January 1, 1993, have owned residential property in the ten year floodplain of the Housatonic River, from the General

---

3. Even if the court allows defendant's motion to exclude O'Connor's testimony, such a ruling would not necessarily dispose of plaintiffs' claims for abatement of the nuisance because proof of unreasonable interference with the use and enjoyment of property may come from the testimony of the plaintiffs themselves.

Electric Plant in Pittsfield, Massachusetts, down river to Woods Pond.

Plaintiffs' Renewed Motion for Class Certification, Docket No. 159 at 1. Defendant opposes the certification of the class, arguing that joinder is the better vehicle for the case.

Class certification is governed by Fed. R.Civ.P. 23, which requires the court to determine, after a "rigorous analysis," whether plaintiffs meet a two-prong test. The first prong, Rule 23(a), requires plaintiffs to meet four "prerequisites": 1) the class must be so numerous that joinder is impracticable, 2) there must be questions of law or fact common to the class, 3) the claims or defenses of the named plaintiffs must be typical of those of the class, and 4) the named plaintiffs must fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). The second prong requires the court to find one of three factors that makes a class "maintainable." Fed.R.Civ.P. 23(b). In this case, the parties agree that the relevant factor is Rule 23(b)(3), which allows a class to proceed if

> questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

Though the parties spar briefly over the numerosity element,[4] they agree that the crux of the dispute lies in the Rule 23(b)(3) requirements of predominance of common issues and superiority of the class form. Plaintiffs claim that common issues predominate in this case because the plaintiffs were all injured by the same defendant in the same way. All of them own river-front property contaminated with PCBs that came from General Electric down the Housatonic River. Therefore, plaintiffs contend, all issues of liability will be common to the class. Plaintiffs concede that the extent of contamination, and possibly the ensuing real estate devaluation, will differ among the putative class members, but argue that this dissimilarity pertains to damages only, not to liability. Plaintiffs ask that the court try liability as a class action and leave damages for individual adjudication. *See Sterling v. Velsicol*, 855 F.2d 1188, 1197 (6th Cir.1988) (upholding certification of class for trial of liability only). Defendant opposes certification, and points to differences in both the likely proof of claims and the possible defenses maintainable here as factors disfavoring class certification.

Defendant has the better argument on this motion. The individual issues are prevalent enough that the class vehicle cannot be considered the superior one for this case. This conclusion flows primarily from the elements of the only two causes of action left, nuisance and trespass. *See* 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1785 (2000 Supp.) (stating that an effective Rule 23 inquiry must examine the elements of the cause of action). To show a negligent trespass, plaintiffs will have to show that since July 1992, defendant has been negligent and that the defendant's negligent "entry" onto the plaintiffs' lands—that is, GE's release of PCBs which entered on plaintiffs' properties—caused them harm. *DeSanctis v. Lynn Water and Sewer Comm'n*, 423 Mass. 112, 118, 666 N.E.2d 1292 (1996).

---

4. According to plaintiffs, the number of persons in the class is about 170—defendant estimates the number at 89. Defendant claims that joinder is not "impracticable" because the potential class members are limited and are confined to a small geographic area. Fed.R.Civ.P. 23(a).

To show a private nuisance, plaintiffs must prove "an unreasonable interference with the use and enjoyment of the property," *see Asiala v. City of Fitchburg,* 24 Mass. App.Ct. 13, 17, 505 N.E.2d 575 (1987), and to recover under public nuisance, they must prove unreasonable interference with a right common to the general public, and that each plaintiff has suffered a special injury other than that borne by the public at large. *See Lewis v. General Elec. Co.,* 37 F.Supp.2d 55, 60–61 (D.Mass.1999).

To judge whether there has been a harmful enough invasion by PCBs for liability to attach under nuisance and trespass, an expert must necessarily measure the extent of the contamination of the individual properties and their potential exposure to future contamination. The individual characteristics of each plaintiff's property are crucial to this analysis. A riverbank made up of a concrete retaining wall will not necessarily be unreasonably contaminated by PCBs, while a loam riverbank could be. Even plaintiffs' expert concedes that the contamination will differ from property to property, depending on "the slope of the bank ... the surface material on the property.... Is it sand; is it loam; is it rocks; is it concrete?" Defendant's Opposition, Docket No. 171, Ex. 3 (Loitherstein Dep.) at 41–42.

These differences pertain not just to damages, as plaintiffs argue, but to the threshold question of whether the contamination constitutes a nuisance or trespass. On the facts of record as assembled, the court has no guarantee that every recorded level of PCB contamination suffered by the members of the proposed class, no matter what the land's characteristics or what it is typically used for, is necessarily of sufficient gravity to constitute a nuisance or trespass. A class under Rule

23(b) is therefore not appropriate in this case.

A separate order will issue.