[Cite as *George v. R. Good Logistics, L.L.C.*, 2013-Ohio-16.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

| | | |
|---|---|---|
| ROB GEORGE, et al., | : | |
| | | CASE NOS. CA2012-06-008 |
| Plaintiffs-Appellees, | : | CA2012-06-009 |
| | | CA2012-06-010 |
| | : | |
| - vs - | | O P I N I O N |
| | : | 1/7/2013 |
| | | |
| R. GOOD LOGISTICS, LLC, et al., | : | |
| | | |
| Defendants-Appellants. | : | |

CIVIL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 10 CV 028536

Keating Muething & Klekamp PLL, Gregory Utter, Joseph M. Callow, Jr., David T. Bules, One East Fourth Street, Suite 1400, Cincinnati, Ohio 45202; Lindhorst & Dreidame Co., L.P.A., James F. Brockman, Bradley D. McPeek, James L. O'Connell, David E. Williamson, 312 Walnut Street, Suite 3100, Cincinnati, Ohio 45202; and Charles D. Hubler, 201 S. Barron Street, Eaton, Ohio 45230, for plaintiffs-appellees, Rob & Alicia George, Tom & Debra Crumbaker, and William Harris

Katz, Teller, Brant & Hild, Robert Pitcairn, Matthew A. Rich, 255 East Fifth Street, Suite 2400, Cincinnati, Ohio 45202-4787 and Edmund H. Kalil, 208 North Barron Street, Eaton, Ohio 45320, for defendant-appellant, R. Good Logistics, LLC

Faruki Ireland & Cox P.L.L., D. Jeffrey Ireland, Erin E. Rhinehart, 500 Courthouse Plaza, S.W., 10 North Ludlow Street, Dayton, Ohio 45402 and Van Kley & Walker, LLC, Jack Van Kley, 132 Northwoods Blvd., Suite C-1, Columbus, Ohio 43235, for defendant-appellant, Cargill, Inc.

Ulmer & Berne LLP, Frederic X. Shadley, Dacia R. Crum, 600 Vine Street, Suite 2800, Cincinnati, Ohio 45202-2409 and Lathrop & Gage LLP, Jennifer Hannah, 10851 Mastin Blvd., Suite 1000, Overland Park, Kansas 66210, *pro hac vice*, for defendant-appellant, Central Salt, LLC

**PIPER, J.**

{¶ 1}   Defendants-appellants, R. Good Logistics, Cargill, Inc., and Central Salt, LLC, appeal a decision of the Preble County Court of Common Pleas certifying a class action law suit on behalf of plaintiffs-appellees.

I. Statement of Facts

A.  Rod Good, Cargill, and Central Salt

{¶ 2}   Rod Good, the owner of R. Good Logistics, owns and operates several companies in the village of Camden, Ohio, including R. Good Enterprises, which is in the business of storing road de-icing salt.  In October 2007, Central Salt, which is in the business of selling and distributing road de-icing salt, contracted with R. Good Enterprises to store its road salt.  In November 2007, Central Salt began to deliver its salt to R. Good Enterprises for storage.  In July 2009, another of Rod Good's companies, Good Rail, agreed to store salt belonging to Cargill, which is also in the business of selling and distributing road de-icing salt. In August 2009, Cargill began delivering its salt to Good Rail.  Both R. Good Enterprises and Good Rail were independent contractors as the companies related to Cargill and Central Salt.

{¶ 3}   Through both R. Good Enterprises and Good Rail, approximately 150,000 tons of salt owned by Cargill and Central Salt were stored outdoors on impermeable pads built by Rod Good.  The pads were constructed according to the Salt Institute guidelines.  Both Cargill and Central Salt were permitted to tarp their respective salt piles, and both did so at various times, using two different tarping companies.  Cargill and Central Salt required that Rod Good store and maintain the salt in compliance with all environmental rules and pertinent regulations.

{¶ 4}   In July 2009, the Ohio Environmental Protection Agency (OEPA) received an anonymous complaint regarding the stored salt at the Good property.  The OEPA examined

- 2 -

and approved the salt storage, noting that surface rainwater remained on site so that salt water would not affect ground water. The OEPA also confirmed that Rod Good was "doing everything right" regarding his two companies' salt storage and management. However, the OEPA informed Rod Good that the property on which he stored the salt for Cargill and Central Salt was located approximately 10-15 feet above an aquifer that flowed into the wells that supplied drinking water to Camden.

{¶ 5} In February 2010, the Camden mayor and a council member spoke with Rod Good, and asked him to install a drain to dispose of standing muddy water that was being tracked onto the public roadway near the Good property when ice-distributing trucks would come and go. Rod Good then installed a drain to discharge storm surface water runoff from his facility into a dry creek bed that ran along his property. The OEPA visited Rod Good's salt storage facility again in March 2010, and learned of the drain. The OEPA still intimated that Rod Good was properly managing the salt piles.

{¶ 6} According to Cargill's handling agreement with Rod Good and Good Rail, Rod Good was required to inform Cargill of any communication with regulatory agencies, including the OEPA. However, Rod Good failed to inform Cargill (or Central Salt) of his communications with the OEPA, or that he had installed the drain for runoff into the dry creek bed. When Cargill became aware of the prior communication between the OEPA and Rod Good, as well as the installation of the drain, it inquired with the OEPA, and the agency related its belief that "the practices employed by Mr. Good appear to be satisfactory."

## B. Camden's Drinking Water

{¶ 7} In 2002, Camden was told by the OEPA that its drinking water came from a shallow aquifer susceptible to contamination and that it was "critical that potential contaminant sources are handled carefully with the implementation of appropriate protective

strategies." The OEPA demanded that Camden establish an emergency back-up water supply, as required by Ohio law. The OEPA's insistence that Camden find an additional/alternative water supply went unheeded by the village.

{¶ 8} In August 2010, Camden residents began complaining about the taste of their water. The OEPA determined that chlorides had infiltrated Camden's wells, which created water that tasted of salt. Despite the salty taste, the OEPA determined that the water was safe to drink, and shared that finding with the residents of Camden. The OEPA ordered Camden to provide a new water source by October 30, 2010, and directed Camden to connect to the Southwest Regional Water System (SRWS), which had an ample supply of high-quality water. Instead, the village hooked into the Klapper Well, a preexisting well known to be high in iron. The OEPA approved the use of the Klapper Well until March 12, 2011. This approval was known to be temporary.

{¶ 9} On November 12, 2010, Camden began pumping water to its residents from the Klapper Well. The OEPA advised that water high in iron content would cause "discoloration" and "staining," but that the water was safe to consume and use. Camden continued providing water from the Klapper Well until January 12, 2012, ten months past its approved use-date. Camden obtained the OEPA's approval to provide its residents with water from the Jered property, a new well, which is now currently serving the residents' water needs.

C. Class Action Proceedings and Class Action Plaintiffs

{¶ 10} Plaintiffs-appellees, Rob and Alicia George, Tom and Debra Crumbaker, and Willie Harris (Plaintiffs) are residents of Camden, who filed suit against Rod Good (and his companies), Cargill, and Central Salt alleging that they suffered damages from using and consuming contaminated water from Camden's public water system. Plaintiffs alleged that the contaminated water was caused by the improper storage of road salt by Rod Good,

Cargill, and Central Salt. Plaintiffs' complaint alleged negligence, negligence *per se*, strict liability, nuisance, and trespass. Within their complaint, and subsequent amended complaints, Plaintiffs filed on behalf of a class, claiming that they properly represented a class of Camden residents and businesses who have suffered damages from the use of contaminated water. More specifically, Plaintiffs filed a motion pursuant to Civ.R. 23 for certification of the following class: "all persons and businesses who reside or have resided in the Village of Camden, who receive or have received water through the Village of Camden's public water system, from August 1, 2010 through the present."

{¶ 11} Cargill and Central Salt filed answers, and argued that class certification was improper. The trial court held a hearing on the matter, at which Rod Good appeared for the sole purpose of adopting the arguments of Cargill and Central Salt that class certification was improper. However, Rod Good did not file any memorandum with the trial court, and left the hearing before presenting his own separate arguments. The trial court found that class certification was proper, and also bifurcated the trial into separate stages to determine liability first and then damages.

{¶ 12} Cargill and Central Salt filed briefs with this court, challenging the trial court's ruling. Rod Good filed a brief, limited to only adopting the arguments and assignments of error set forth in Cargill's brief. Therefore, when this court addresses Cargill's arguments, we are also addressing those espoused by Rod Good.[1] For ease of discussion, we will discuss Cargill and Central Salt's first assignments of error together, as they are identical.

---

1. Plaintiffs argue that this court should not consider Rod Good's appeal because of his lack of participation at the trial level, as well as his lack of a meaningful appellate brief. However, Rod Good did appear at the hearing to make a record that he was espousing Cargill and Central Salt's arguments, and also filed a notice of appeal as well as a brief to espouse Cargill's assignments of error. Therefore, we will consider Rod Good's appeal, but confine it to the arguments raised by Cargill.

II. Cargill and Central Salt's First Assignment of Error

{¶ 13} THE TRIAL COURT ERRED BY GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

{¶ 14} Cargill and Central Salt argue in their first assignment of error that the trial court erred in granting Plaintiffs' motion for class certification.

{¶ 15} The Ohio Supreme Court has recognized that there are seven requirements to class action certification, essentially recognizing two implied elements in addition to the five express elements set forth in Civ.R. 23.

> (1) An identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be met.

*Stammco, L.L.C. v. United Tel. Col. of Ohio*, 125 Ohio St.3d 91, 2010-Ohio-1042, ¶ 6. Civ.R. 23(B) requires that the court make a finding that:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> > (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Also within Civ.R. 23(B)(3), the following factors are set forth for consideration regarding a common question of law or fact.

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

In order to certify a class, a trial court must find that all seven elements are met, and must do so by a preponderance of the evidence. *Warner v. Waste Mgt. Inc.,* 36 Ohio St.3d 91 (1988).

{¶ 16} A trial court's determination regarding class certification will not be disturbed absent a showing of an abuse of discretion. *Howland v. Purdue Pharma L.P.,* 104 Ohio St.3d 584, 2004-Ohio-6552, ¶ 25. An abuse of discretion is more than a mere error of law or judgment, instead requiring a finding that the trial court's decision is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 17} In *Howland*, the Ohio Supreme Court reversed the decision of this court, which upheld a class certification. Within *Howland*, the supreme court made it clear that a trial court's discretion when determining whether a class can be properly certified is not unlimited, and instead, is "bounded by and must be exercised within the framework of Civ.R. 23." *Howland* at ¶ 25. The court went on to state that a "trial court is required to carefully apply the class action requirements and conduct a rigorous analysis into whether the prerequisites of Civ.R. 23 have been satisfied." *Id.* The supreme court noted that the trial court in that

case had "failed to analyze or even mention any of the specific problems argued by the appellants," failed to analyze pertinent federal case law, and determined issues by "summarily" offering conclusory answers rather than a full analysis of the issues. *Id.* at ¶ 21.

{¶ 18} In reversing, the *Howland* court specifically found that,

> [W]here the trial court completely misconstrues the letter and spirit of the law, it is clear that the court has been unreasonable and has abused its discretion. A trial court that dispenses with a party's arguments in such a fashion, fails to examine a well-established doctrine, and ignores nearly identical federal proceedings does not merely misconstrue the letter and spirit of the law—it ignores them.

*Id.* at ¶ 26. The trial court's opinion in the case at bar is similar to the one analyzed in *Howland*, as the trial court summarily dismissed the majority of Cargill and Central Salt's arguments without articulating any factual analysis. The trial court's failure to rigorously analyze the issues would be enough to reverse the trial court's decision. However, we also find that reversal is necessary because several of the prerequisites of Civ.R. 23 have not been satisfied by a preponderance of the evidence.

## A. Identifiable Class

{¶ 19} As stated by the Ohio Supreme Court, the definition of the class must be unambiguous so that the description of it is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Stammco* at ¶ 7. The trial court certified the following class: "all persons and businesses who reside or have resided in the Village of Camden, who receive water or have received water through the Village of Camden's public water system, from August 1, 2010 through the present."

{¶ 20} The trial court's written decision seems to have also added a term that the class is specific to those "harmed during a particular time (August 1, 2010 to present)."[2] The trial

___

2. The court was likely referencing the fact that Ohio law requires that before a plaintiff may recover for negligence, the party must demonstrate that they were damaged by the defendants' actions, as well as that the

court acknowledged that the "task of identifying class members may be difficult" but that "the task is not unmanageable." However, there is no indication in the record that the court would be able to determine whether a particular individual is a member of this class without first determining whether that individual was harmed during the time frame set forth. The mere fact that someone received water from the public water supply does not establish the fact that the person has been "harmed" as anticipated in the trial court's class certification. *See Player v. Motiva Ents. LLC.*, D. New Jersey No. Civ. 02-3216(RBK), 2006 WL 166452 (Jan. 20, 2006) (finding that "the release of contaminants into the groundwater aquifer does not itself generate damages, unless Plaintiffs can show that they suffered harm").[3]

**{¶ 21}** Instead, the trial court would have to first conduct an inquiry into whether there was sufficient proximate cause to establish that the potential class member had been harmed due to consumption or use of the water. This blanket inquiry would also have to take into consideration numerous intervening forces, such as the village's own actions that may have contributed to the water conditions. See *Lasson v. Coleman*, 2nd Dist. No. 21524, 2007-Ohio-3443, ¶ 28 (noting that a class is ambiguous and not sufficiently definite where "it would require an individualized determination of each case prior to determining if the party was a member of the class").

**{¶ 22}** Moreover, it is unfeasible to define a class as all persons who live or have lived in Camden, as well as all businesses that conduct or have conducted business in Camden

---

actual harm proximately resulted from the breach. *Menifee v. Ohio Welding Products Inc.,* 15 Ohio St.3d 75 (1984). *See also Bentley v. Honeywell Int'l., Inc.,* 223 F.R.D. 471, 477 (S.D.Ohio 2004) (noting that "important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner").

3. Class certification in federal cases is governed by Fed.R.Civ.P. 23, which is almost identical to Ohio's Civ.R. 23. Therefore, we find federal case law persuasive when analyzing the issues set forth in this case.

from August 2010 to the present.[4]  There is no articulation in the record as to how the court would be able to identify every past and present resident of Camden, including renters, children, or those who resided in Camden but did not sign a lease or purchase property.  Nor is there any indication as to how one would be able to ascertain the current whereabouts for every past resident who consumed water.

{¶ 23}  The trial court suggested it could identify class members "by referring to current and past customer lists for the village of Camden's public water system and other public documents."  While the court may have been able to identify property owners, or even customers registered with the water utility, there is no indication that all of the other "residents" of Camden could be identified and located using these or any other means.

{¶ 24}  We would also note that the class is not unambiguous because the certification applies to those who received water "through the present."  However, the record is clear that Camden deliberately decided not to tap into the water sources suggested by the OEPA, being the SRWS, knowing the Klapper Well would provide water containing iron.  Regardless, the village eventually tapped into a good water source, starting in January 2012, when the well on the Jered property began providing water to Camden residents.  The class, as certified by the trial court, however, would have included those individuals who moved to Camden after January 2012, who have never been exposed to the Klapper Well or water from the village prior to the Klapper Well as a source.  Simply stated, the class definition certified by the trial court is impermissibly indefinite and ambiguous.

B. Numerosity

{¶ 25}  For similar reasons, a preponderance of the evidence fails to demonstrate that the class is so numerous that joinder of all members is impracticable.  While the trial court

---

4.  We would also note the impropriety of businesses being named in the class, but not a single business is represented within the current plaintiff class.

accepted Plaintiffs' claims that the class includes over 800 households, over 2,300 individuals, as well as dozens of businesses, there is no indication in the record that this large amount of possible plaintiffs were actually *harmed* by the water. Moreover, the trial court placed significance on the amount of filings in the case, and determined that "one need only look at the volume of paper generated in this case to recognize that no single individual or business would have any motivation to, on his or her own, pursue a claim against those potentially responsible for the contamination." While we agree with the trial court that there is already a substantial record created in this matter, the "volume of paper generated" is insufficient to establish numerosity of *plaintiffs*.

{¶ 26} A party moving for class certification must provide evidence that a number of people have been harmed by actions of the defendant(s), and the mere possibility that members of the class exist is insufficient to meet the numerosity requirement. *Miranda v. Saratoga Diagnostics*, 8th Dist. No. 97591, 2012-Ohio-2633. We are not saying that Plaintiffs were required to submit the exact number of potential class members, or that Plaintiffs could not provide a reasonable estimate to the trial court to demonstrate by a preponderance of the evidence that they fulfilled the numerosity element. However, Plaintiffs failed to provide the trial court with a reasonable estimate of the number of potential class members who were actually harmed by the salty or iron water because they merely cited the village's population, as well as any and all businesses within Camden. While Plaintiffs assert that a large class of plaintiffs exists, the record only indicates that a large number of Camden residents *could possibly* be a member of the class. Even that possibility requires us to assume that all potential members were harmed by consuming or using the water. However, such assumptions and possibilities do not fulfill Plaintiffs' burden to demonstrate numerosity.

C. Predominance

- 11 -

{¶ 27} The trial court also abused its discretion in finding that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, according to Civ.R. 23(B)(3).

{¶ 28} "In determining whether common questions of law or fact predominate over individual issues, it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." *Schmidt v. Avco Corp.*, 15 Ohio St.3d 310, 313 (1984); *see also Knoop v. Orthopedic Consultants*, 12th Dist. No. CA2006-07-048, 2007-Ohio-1371. Civ.R. 23(B)(3) also sets forth the following factors to consider when determining whether there exists a common question of law or fact.

> (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

{¶ 29} As previously stated, the trial court's certification assumed that each member of the class would be able to demonstrate that they were harmed by consuming or using the water. The trial court recognized that "individualized issues of damages may be significant, but they clearly do not predominate." However, not only is the damages question different for each plaintiff, but also the causation issue is highly individualistic. Common questions of fact and law do not predominate because resolution of each plaintiffs' case could not be obtained through a single adjudication.

{¶ 30} Instead, the record clearly indicates that Plaintiffs sued three different defendants, alleging that any or all of the defendants contaminated the water supply through

disparate actions. However, to claim a common issue of law or fact, there needs to be a single course of conduct from which the plaintiffs suffer similar harm. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir.1988). The *Sterling* court specifically addressed the issue of "single course of conduct" as it relates to mass tort claims.

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*Id.* at 1197. The Sixth Circuit later applied its reasoning in *Sterling* to a case where plaintiffs were seeking class action certification after multiple people developed cancer after exposure to nuclear weapons manufacturing. *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir.2004). In *Ball*, the Sixth Circuit determined that class action certification was improper where there "are multiple Defendants with presumably differing liability levels, if any. Accordingly, there is no 'single course of conduct.'" *Id.* at 728.

{¶ 31} Plaintiffs allege negligence, negligence *per se*, strict liability, nuisance, and trespass against three different defendants. If any or all of these defendants were found to have been negligent, or found to have committed a nuisance or trespass, it is likely that each of these defendants would have a different liability level. This liability, if any, would be predicated upon the damage they caused to each plaintiff. There is simply no single course of conduct, as any liability associated with the salty or iron-laden water could have multiple sources and is based on several different events, such as the storage of salt on the Good property, the tarping procedures employed by Cargill and/or Central Salt, Good's drainage of runoff water into the dry creek bed, the village tapping into a well-known to contain high levels

of iron, and so on.

{¶ 32} In order to prove such damages, it is necessary for *each plaintiff* to demonstrate in what way he or she has been harmed by the various actions of *each defendant*. This is not a case where the same evidence is dispositive for each plaintiff's claims, such as a plane crash or even dangerous water contamination from a single defendant. *See Sterling,* 855 F.2d at 1197 (affirming certification of class action where "almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and the type of injuries allegedly suffered, and the defendant's liability"); and *Lowe v. Sun Refining & Marketing Co.,* 73 Ohio App.3d 563, 570 (6th Dist.1992) (affirming certification of class action where "all damages were incurred as the result of one incident, the toluene spill").

{¶ 33} In cases such as a plane crash and dangerous water contamination, the harm to each plaintiff is patently the same, though individual injuries may differ by degree. Here, however, the OEPA determined multiple times that the water was safe to consume, whether it tasted of salt or had high iron content. Therefore, each plaintiff would need to separately address in what way he or she was actually damaged by using either the salty water, the iron-rich water, or by being hooked into the Klapper Well (an act that also implicated the village and its decision-making process).

{¶ 34} For this, and other reasons, several courts have declined to certify class actions when individualized proof of causation is necessary in environmental contamination cases. *See Church v. General Electric Co.,* 138 F. Supp. 2d 169 (D.Mass.2001) (denying class action certification where "individual characteristics of each plaintiff's property are crucial" to their nuisance and trespass claim); *Mattoon v. Pittsfield*, 128 F.R.D. 17, 21 (D. Mass.1989) (denying class action certification where "proximate cause will necessarily be different for

every person in the proposed class, based on each person's length of exposure to contaminated water," as well as the fact that there were multiple defendants, each with its own possible liability); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo.1994) (denying class action certification where "individual issues of causation and damage so overshadow those in numerosity and complexity to render a class action unhelpful"); and *Mays v. Tennessee Valley Authority*, 274 F.R.D. 614 (E.D.Tenn.2011) (denying class action certification where individualized inquires predominated over common issues because any liability and damages would be specific to each plaintiff's property, the property value, and outside factors that may have contributed to property damage).

{¶ 35} Presumably, each resident of Camden may have used the water. However, there is no indication in the record that each resident suffered damages, let alone, the same nature of damages. Each plaintiff and each resident would have different experiences regarding the water, and how each was individually impacted by using the water. Therefore, each member of the class would have an interest in individually controlling the prosecution of the action based on what individual damages each incurred, and we are unable to say that each plaintiff would find concentrating all of the litigation claims as one class action in the common pleas court desirable. See *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 271-272 (3rd Cir.2011) (affirming denial of class action certification where "not all claims of property damage based on exposure are alike," and because "single instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways"); *Reilly v. Gould*, Inc., 965 F.Supp 588, 598 (M.D.Pa.1997) (denying class action certification where "whether and to what extend the [lead] emissions are said to have affected each class member is not common to all involved"); and *Fisher v. Ciba Specialty Chem. Corp.*, 238 F.R.D. 273, 305 (S.D.Ala.2006)

(denying class action certification where defendant's liability would turn on "individual-specific questions" such as whether the plaintiff's property is contaminated, what the source of those contaminates are, and the extent of harm to each plaintiff's property).

{¶ 36} One plaintiff testified that each resident of Camden had "their own story to tell," and the record also reflects that each resident of Camden was exposed to different types and levels of water contamination. For example, the water quality was different depending on how close each resident was to the water source and a main line that connected the home to the water source. The farther residents lived from the main water line, the more contamination they would incur. Therefore, some plaintiffs experienced staining to their laundry, while others did not. Some were able to drink the water, while some were not. Another plaintiff even testified that her experience was different from other residents (her mother and mother-in-law) who had clear water, where she had dark water on certain days. There was also evidence that other Camden residents did not suffer any damages from the water, and in fact, continued to drink and use the water with no complaints. A former plaintiff, who has since been dismissed from the case, testified that the water was acceptable for drinking purposes and for other uses.

{¶ 37} Nor would each plaintiff have the same damages, even if all were able to prove their causes of action. For example, one plaintiff argued that part of the damage was having to use more chemicals in the family swimming pool to treat the contaminated water, as well as having to replace plumbing fixtures inside the home. Another suggested that damages included having to purchase bottled water for consumption. Another plaintiff raised chickens, and moved the chickens to a different location so that they would not be exposed to contaminated water. However, there is absolutely no indication in the record that all or any members of the proposed class would have predominantly similar damages as these other

individual plaintiffs.

{¶ 38} Any benefit of certifying a class in this context based on the commonality of consuming salty or iron-ridden water is soon vitiated by the fact that each plaintiff has a separate alleged injury and each instance varies regarding the necessary elements of the supposed torts. Therefore, there are inherent difficulties likely to be encountered in the management of a class action. In fact, the trial court recognized that members of the class would have "different experiences with respect to damages" and that "individualized issues of damages may be significant." The trial court unreasonably disregarded its own conclusions when finding predominance of common issues of fact and law where this case is predicated upon individualistic alleged claims, injuries, and damages.

{¶ 39} After reviewing the record, we find that the trial court abused its discretion by certifying the class where Plaintiffs have failed to prove by a preponderance of the evidence that they have fulfilled each of the elements necessary for proper class certification. As such, Cargill (and Rod Good) and Central Salt's first assignments of error are sustained. The trial court's decision certifying the class is reversed and such decision is vacated.

III. Cargill and Central Salt's Second Assignment of Error

{¶ 40} THE TRIAL COURT ERRED BY GRANTING PLAINTIFFS' MOTION TO ESTABLISH A TRIAL PLAN AND TO BIFURCATE TRIAL.

{¶ 41} Cargill and Central Salt argue in their second assignment of error that the trial court erred by having the parties establish a trial plan and by bifurcating the trial into separate phases of liability and damages. However, given our determination that the trial court abused its discretion in certifying the class action, we find this assignment of error moot.

{¶ 42} Judgment reversed, and the cause is remanded for further proceedings.

RINGLAND, P.J., and M. POWELL, J., concur.