446 So.2d 375 (1984)
ACADIAN HERITAGE REALTY, INC., Plaintiff-Appellee,
v.
The CITY OF LAFAYETTE, Defendant-Appellant.
No. 83-242.
Court of Appeal of Louisiana, Third Circuit.
February 1, 1984.
Writ Denied April 2, 1984.
*377 Voorhies & Labbe, Marc W. Judice, Lafayette, for defendant-appellant.
Koury & Koury, Constance A. Koury, Fruge & DeJean, Kenneth W. DeJean, Lafayette, for plaintiff-appellee.
J.M. Wooderson, Lafayette, for defendant-appellee.
Before GUIDRY, CUTRER and STOKER, JJ.
STOKER, Judge.
The City of Lafayette appeals from a judgment rendered against it and in favor of Acadian Heritage Realty, Inc. (Acadian) for damages in the amount of $299,653.87.
Acadian originally filed suit seeking to enjoin the City from beginning any type of operations on property it had purchased for the purpose of establishing a sanitary landfill. Acadian amended its petition after operation of the landfill had begun seeking damages for the alleged negligent operation and placement of the landfill. After trial on the merits between Acadian and the City, the trial court rendered judgment in favor of Acadian as stated above. The City appeals.
This case was previously before this court as a result of a judgment in favor of a number of intervenors in this suit. See Acadian Heritage Realty, Inc. v. City of Lafayette, 434 So.2d 182 (La.App. 3rd Cir. 1983), writs denied 440 So.2d 733 (La.1983), hereinafter referred to as Acadian # 2. In this case separate trials were held, one between the intervenors and the City and the other between Acadian and the City. The claim of the intervenors was the subject of the appeal in what we refer to as Acadian # 2. Although the record from the intervenors' trial was made part of the record in Acadian's trial, Acadian took no part in the intervenors' trial. In this appeal we consider only those matters resolved as a result of Acadian's trial.
In its original brief on appeal, the City made the following assignments of error:
"I. The trial court erred in making determinations of fact concerning the operation and condition of said landfill particularly as said operation affects any of the health or well-being of the residents due to any possible water pollution.
"II. The trial judge erred in ruling that the Defendant-Appellant is liable for `incidental damages' suffered by the public generally as a result of the construction of sanitary landfill.
"III. The sanitary landfill operation did not constitute a nuisance as to Plaintiff-Appellees, (sic) Acadian Heritage.
"IV. The trial judge erred in exceeding her `much discretion' allowed the tryer of fact by accepting the unsupported opinion of Plaintiff-Appellees (sic) expert and rejecting well founded evidence presented *378 by Defendant-Appellant's experts, therefore, the quantum awarded is excessive.
"V. The trial court erred in overstepping the bounds of participating in the trial on the merits as an advocate for Plaintiff-Appellees. (sic)
"VI. The trial court erred in ordering a `conditional permanent injunction' be issued against the Defendant-Appellant."
By way of supplemental briefs, the City added the following assignments of error:
"VII. The trial court erred in awarding damages to Plaintiff-Appellee for Oakridge property as that property was sold by Plaintiff-Appellee before trial at a profit.
"VIII. The trial court erred in allowing damages for the decrease in the market value of property without ruling as to whether the sanitary landfill is an ultrahazardous activity as dictated by the Supreme Court in Hero Lands Co. v. Texaco, 310 So.2d 93 ([La.] 1975)."
For reasons set out below, we amend the award of damages to Acadian and otherwise affirm the judgment of the trial court.

FACTS
On April 5, 1978, Dorothy Bundrick and Michael DeClouet purchased a 6.83-acre tract of land for $40,980. They subsequently sold the land to Acadian for $32,810 on November 7, 1978. At the time of trial Mrs. Bundrick was the president and sole shareholder of Acadian. Mr. DeClouet's status is not clear.
Acadian began development of the 6.83acre tract in May of 1978 as Brookshire Subdivision. On February 20, 1979, Acadian purchased another piece of property consisting of approximately twelve arpents for $90,000. This property was originally intended for development as Oakridge Subdivision. Brookshire is located approximately 1200 feet east of the landfill and Oakridge is adjacent to it.
On May 4, 1979, the City purchased a 60.78-acre tract which it intended to develop into a sanitary landfill. Acadian unsuccessfully sought to enjoin the construction of the landfill. After operation of the landfill began in May of 1980, Acadian amended its petition seeking damages for the negligent operation and placement of the landfill.
The damages awarded to Acadian consist primarily of the loss of anticipated profits from the development of Brookshire and Oakridge Subdivisions.
Although some of the City's assignments of error are overlapping, we will attempt to address each one individually.

I. WATER POLLUTION
The City objects to the trial court's finding as to water pollution and thoroughly discusses the reliability of water samples presented on behalf of itself and Acadian. With regard to this issue the trial court stated:
"For brevity's sake the Court will not go into great detail regarding these samples. While it is alarmed by the results of some of these tests, there does not seem to be enough evidence for it to reach an opinion as to the conclusion to be drawn at this time. Ms. Roberts stated that bacteria may appear one day and be absent the next; therefore, the fact that none appeared does not disprove contamination. The Court feels the situation should be monitored carefully since there was such negligence exhibited in the excavations at the site."
It is apparent from the above quotation that the trial court did not find that water in the area was presently contaminated. The court did find that due to the manner in which digging was conducted at the landfill there was a possibility of future contamination. This finding is adequately supported by the record.
An important feature of this property is its underlying clay base. The clay will prevent or at least retard the seepage of leachate, i.e. contaminated water, into the water table and subsequently into neighboring wells. In excavating the site for filling, ground stakes were not placed to *379 indicate how deep the digging should go. The measurement was made only by estimation and there was testimony that clay and dirt were kept available to fill areas that had been cut too deep. There is a distinct possibility that the clay was penetrated allowing the leachate easier access to the water table. Various testimony also indicates that there were drainage problems at the landfill. This could result in the formation of leachate.
There is no clear error in the trial court's limited findings regarding contamination of the water.
We have discussed the matter of the threat or potentiality for water pollution because the City has made it a significant issue on appeal. However, with respect to Acadian's claim for damages, the relevancy of the issue is not too apparent. As we see it, the trial judge's findings concerning the absence of pollution in fact, but with a possibility that there might be pollution in the future, simply buttresses the trial court's general conclusion that the area surrounding the landfill suffered a diminution in land value merely because the landfill and landfill operation existed.

II. DAMAGES FROM LANDFILL EXISTENCE
The City takes the position that any decrease in the market value of Acadian's property resulted solely from the existence of the landfill and not from its operation. The City asserts further that the decrease in value due to the mere existence of the landfill is not compensable.
Although we find that some of the decrease in value of the land was due to the negligent operation of the landfill, we find further that damages resulting from the "stigma" attached to the landfill may be recovered.
When this case was first before this court on the issue of whether Acadian had a cause of action for damages resulting from the mere construction of the landfill, we held that Acadian did have such a cause of action. Acadian Heritage Realty, Inc. v. City of Lafayette, 394 So.2d 855 (La. App. 3rd Cir.1981), hereinafter referred to as Acadian # 1. As was pointed out in a concurrence to that opinion, there should be a balancing of interests to determine whether a plaintiff should recover for any inconvenience or damage suffered.
In the appeal concerning the intervenors in this matter, we made such a balancing of interests and found that there should be recovery. Acadian # 2. We reach the same result in this case. As stated frequently at the trial of this case, a landfill is a unique operation. Some of the obvious effects of even a well-run landfill are increased traffic, increased noise level from the required machinery, and a change in the general appearance of the area. As clearly demonstrated at trial, the public perceived these negative effects even before operation of the landfill had begun. This perception caused damage to Acadian for which they should recover.

III. LANDFILL AS A NUISANCE
As in the previous appeal from the judgment in favor of intervenors, the City argues that the trial court erred in finding that the activities on the landfill constituted a nuisance. We disagree. The landowners and residents in the area surrounding the landfill testified almost without exception that there were noxious odors emanating from the landfill, that the roads leading up to the landfill became more littered, that there was excessive noise in the area, and that there was an increased problem with flies and rodents. Existence of some of these problems was supported by photographs submitted into evidence. Existence of others is also supported by findings of various inspectors of the landfill.
Problems reported by inspectors at various times at the landfill are those which could cause the complaints by neighbors. Of particular importance is the continued problem of the failure to cover the garbage daily with six inches of dirt. The apparent purposes of the cover are to prevent escaping odors and to discourage flies and rodents. Also noted as a problem on at least *380 one report was the presence of the flies and excessive odor down wind from the landfill. Landfill employees were using a lemon-scented disinfectant in an attempt to control the flies. Inspectors from the Department of Natural Resources recommended that an insect spray or fly repellent be used.
Based on the evidence presented at trial we cannot say that the trial court was "clearly wrong" in finding that the landfill constituted a nuisance.

IV. AMOUNT OF DAMAGES

A. Brookshire Subdivision
Acadian developed Brookshire to include seventeen residential lots. Mrs. Bundrick testified that she anticipated selling three of the lots without homes in order to stimulate interest in the area and the remaining fourteen lots with homes. Four of the lots were either sold or committed through purchase agreements during the first five months of 1979 prior to the announcement of the landfill. Three of the lots sold for $10,000 and one for $9,500.
During the remainder of 1979 only three more sales were made. One was a lot for $9,000 and two were lots on which homes had been built. In order to sell the homes, Acadian agreed to pay closing costs on the transactions. Two more lots with homes were sold in January of 1980 and Acadian paid closing costs on these sales also. There were no further sales until December of 1980 when two lots were sold as a package to a developer for $8,000 each. Three more lots were sold in the second half of 1981 for $10,500 each and three lots remained unsold at the time of trial.
There was sufficient testimony at trial to establish that the difficulty in selling lots after May of 1979 was due to the announcement and subsequent development of the landfill. Certain price reductions and other concessions had to be made by Acadian in order to make sales.
In the development of a subdivision, time is a crucial factor. Usually a mortgage on property securing loans for development is discharged in part as each lot is sold. Therefore, a slowdown in sales will cause additional interest to accrue. Because of the difficulty in making sales, Acadian incurred additional debt in order to pay the interest on its loans for the development and purchase of Brookshire. Guaranty Bank & Trust Company had a mortgage on Brookshire securing the loan made for the purchase of the property. Guaranty also made loans to Acadian totaling $90,000 for the development of the subdivision. Steve Hollier, vice-president of Guaranty, testified that Acadian became delinquent on its account in the latter part of 1979. At one point Acadian could pay neither the interest nor the principal, and the loans had to be refinanced. He stated further that before the loans were paid out in January of 1981, Acadian had paid a total of $50,160.75 in interest ($65 in 1978, $26,605.62 in 1979, $21,163.32 in 1980, and $2,326.81 in 1981).
Mrs. Bundrick testified that there is still a $65,000 mortgage on the three unsold lots. This mortgage is held by Mr. Paul DeClouet who paid the bank which was threatening to foreclose on the property. Proceeds of this lawsuit were also pledged to secure the loan. It is not entirely clear what portion of the $65,000 was needed to pay the interest incurred as a result of the landfill. Mrs. Bundrick stated that the $65,000 included "principal and interest." Presumably the principal she referred to is the amount Mr. DeClouet paid the bank and the interest is that owed to Mr. DeClouet on the new loan. It is apparent that not all of the $50,160.75 in interest paid to the bank is attributable to the delays caused by the landfill. However, an additional undetermined amount of interest is owed to Mr. DeClouet due to the landfill.
Although all of Acadian's financial transactions and arrangements are not entirely clear to us, we conclude that the trial court was not clearly wrong in concluding that the $65,000 mortgage, less certain reductions we will next discuss, was attributable to inability to sell lots because of the landfill.
*381 In awarding damages regarding the $65,000 mortgage, the trial court reduced the award by the land cost of the three unsold lots apparently on the basis that this was a part of the principal still owed to Guaranty Bank when Mr. DeClouet made his loan. Because the Guaranty Bank mortgage covered both purchase of the land and the cost of development, we find that the award regarding the $65,000 should have been reduced by the amount of the land and development cost attributable to each of the unsold lots.
The trial court incorrectly calculated the land cost of each lot. The purchase price for the property was $32,810, the amount paid by Acadian, rather than $40,980, the amount originally paid by Mrs. Bundrick and Michael DeClouet. The amount paid by Acadian is the proper figure to use since it is the plaintiff in this suit. Thus the cost of each lot was $1,930 ($32810 ÷ 17) rather than $2,410.58 ($40980 ÷ 17) as indicated by the trial court. The cost of developing the subdivision was $68,072. With development cost added to the purchase price of the land ($68,072 + $32,810 = $100,882), the total cost of each lot was $5,934.24 ($100,882 ÷ 17) rather than $6,414.82. The award for the $65,000 mortgage should be reduced by $17,802.72 ($5,934.24 × 3). The amount should be $47,197.28.
The trial judge also awarded Acadian the amount of the closing costs on the four lots with homes which were sold. The reasoning is that payment of the closing costs was a concession that Acadian would not have had to make without the landfill as a factor. These costs total $19,596.92. (The judgment incorrectly gives the amount as $19,597.02.)
No damages were awarded regarding the four lots which were sold prior to the announcement of the landfill, and damages for the four lots with homes were awarded as stated above. For the remaining nine lots, six of which were sold but without homes, the trial court calculated damages according to the profit Acadian expected to make on the lots with homes built on them.
Acadian expected to sell the lots with homes for $58,500 each. The evidence shows that this was a reasonable expectation. Construction costs for the homes would have been $42,000 each. Thus the net profit for nine lots would have been $95,091.84, computed as follows:

Nine homes @ $ 58,500 each $526,500.00
Construction @ $ 42,000 each -$378,000.00
Development @ $ 5,934.24 each - 53,408.16
 _________
 - 431,408.16
 __________
 $ 95,091.84

Since six of these nine lots on which damages were calculated were actually sold, even though without homes, we feel that the above figure should be reduced by the apparent net profit on the sale of these lots. Acadian asserts that it did not in fact profit from these sales due to the continued refinancing of Brookshire, however, that aspect of damages has been covered by the award regarding the $65,000 mortgage. We find that Acadian's total profit on the six lots was $20,894.56. Two of the lots sold for $8,000, one for $9,000, and three for $10,500. We subtracted the cost of each lot at $5,934.24 from each of the purchase prices in order to determine the profit. Thus the total lost profits on Brookshire are $74,197.28 ($95,091.84 - $20,894.56).
We are aware that the City raises several arguments regarding the ability and accuracy of Acadian's experts on real estate appraisal and development. There was substantial disagreement between the City's experts and Acadian's experts regarding the best use of the property and its value both before and after the construction of the landfill. The award of damages by the trial court was not based on the past or present value of the land, but on the loss of profits by Acadian. Such an award is not clearly wrong, therefore, we do not find a discussion of land values to be necessary.
We are also not persuaded by the City's argument that the decrease in sales was a result of the general economic situation at the time or that this situation would have caused the expected profits on the subdivisions *382 to be less. There was sufficient evidence to show that the slowdown in sales was solely attributable to the landfill and that Acadian's profit expectation was realistic.

B. Oakridge Subdivision
Although the Oakridge property was purchased before announcement of the landfill, development had not yet begun on it. After announcement of the landfill, Acadian was unable to obtain financing for the development. In any event, the development no longer seemed feasible in light of the problems suffered by Brookshire.
Acadian anticipated that the presence of Brookshire would enhance the value of Oakridge, making its twenty-five lots worth at least $14,000 each. There is sufficient evidence to support this view. As with Brookshire, Acadian expected to sell most of the lots with homes.
When it became clear that Oakridge could not be developed for residential use, Acadian made efforts to develop it for industrial use. This attempt was unsuccessful and the land was ultimately sold to Mr. Oran Vincent for $100,124.44. Included in this purchase price was Mr. Vincent's assumption of the mortgage on the property with a remaining debt of $55,963.44 and the discharge of a $44,161 debt owed Mr. Vincent by Acadian Heritage. Mrs. Bundrick testified that money had been borrowed from Mr. Vincent in order to pay the notes on Oakridge.
Because Acadian had not yet begun actual development of the Oakridge property, the trial court found that damages based on the sale of homes in the area was too speculative and awarded damages for lost profits based on the sale of developed lots. The expected cost of the development of the lots was $128,478. This cost added to the purchase price of the land, $90,000, gives a per-lot cost of $8,739.12 ($218,478 25). The estimated income on twenty-five lots of $350,000 ($14,000 each) less the cost of $218,478 equals an expected profit of $131,522, the amount awarded by the trial court.
The City argues that because Acadian sold the property prior to trial for a profit, it should not be allowed to recover these anticipated profits. We disagree. Acadian sold the property only in an effort to mitigate its damages. Had it not done so, it would have been left with increased debts due to refinancing and growing interest payments.
We also find that the sale to Mr. Vincent was not made at a profit to Acadian, but was made only for an amount which covered the additional debt already incurred by Acadian in order to meet its original obligation on the purchase of the property. The trial court did not abuse its discretion in awarding damages.

C. Total Damages
The sum total of damages due Acadian is as follows:

 Brookshire
Loss of profits on 9 houses $74,197.28
Settlement charges paid by Acadian 19,596.92
Outstanding debt 47,197.28
 __________
 $140,991.48
 Oakridge
Loss of profits on 25 lots 131,522.00
 __________
 TOTAL $272,513.48

V. PARTICIPATION OF THE TRIAL JUDGE
The City asserts that at one point in the trial, the trial judge departed from her role of impartiality and became an advocate for the plaintiff. We disagree. Trial of this case consumed six days in addition to the five days of trial with the intervenors. At various points throughout the hearings, it appears that both counsel and the judge became somewhat impatient. While this is unfortunate, particularly with respect to the trial judge, we do not find that the City was prejudiced. The incidents complained of by the City resulted primarily from the trial judge's attempt to have all pertinent information before her in making her decision.

VI. "CONDITIONAL PERMANENT INJUNCTION"
As in the previous appeal dealing with the intervenors, the City argues that *383 the trial court judgment of September 10, 1981, issuing a "conditional permanent injunction" was incorrect. That issue was not considered in Acadian # 2 because there was no order of appeal from the judgment in question in that record.
Although an order of appeal from that judgment now appears in the record before us, we cannot consider it in this appeal of Acadian. That judgment was rendered after trial on the merits between the intervenors and the City. Acadian was not a party to those proceedings nor was the judgment rendered in its favor.
We note that the order of appeal now appearing in the record is marked as having been officially filed on July 26, 1983, after the judgment in favor of intervenors had been affirmed and a rehearing denied. The matter has not been properly raised for our consideration.

VII. DAMAGES FOR (OAKRIDGE) SOLD PROPERTY
This assignment has been discussed under the section entitled "IV. AMOUNT OF DAMAGES."

VIII. ULTRAHAZARDOUS ACTIVITY REQUIREMENT
The City argues that under Hero Lands Company v. Texaco, Inc., 310 So.2d 93 (La.1975), the landfill must be found to be an ultrahazardous activity before damages can be awarded for loss of property value. In support of this claim, the City cites the following from the Court's per curiam opinion denying an application for rehearing.
"We have not held that allegations of damage based upon a depreciation of land value because of ordinary constructions and activities on a neighbor's property necessarily state a cause of action. The opinion has held that allegations that the maintenance of an ultra-hazardous construction on defendant's servitude has caused them damage does under the factual allegation state a cause of action."
We are of the opinion that the above quotation indicates that the holding was limited to the case under consideration which did involve an allegation of an ultrahazardous construction. The opinion does not hold that such an allegation was necessary to state a cause of action.
We have previously held that the construction of a sanitary landfill adjacent to and in close proximity to property owned by plaintiff gives rise to a cause of action for damages caused by this proximity which impairs the market value and full use of the neighboring estate. Acadian # 1. We now hold that Acadian has proved its damages and is entitled to recover.

CONCLUSION
For the above reasons, we reduce the amount of the judgment against the City of Lafayette to $272,513.48. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendant-appellant.
AMENDED AND AFFIRMED AS AMENDED.