**Mary Kathryn LEWIS, et al. Plaintiffs**

v.

**GENERAL ELECTRIC CO., Defendant**

**No. CIV.A. 98–30057–MAP.**

United States District Court, D. Massachusetts.

April 8, 2003.

---

**6.** Defendants' counterclaim remains outstanding.   See # 4.

Robert M. Fuster, Robert M. Fuster & Associates, Pittsfield, Emily J. Joselson, Peter F. Langrock, Langrock, Sperry & Wool, LLP, Middlebury, VT, Christine E. Morin, Shapiro, Grace, Haber & Urmy, Boston, MA, for Plaintiffs.

Steven R. Kuney, Williams & Connolly, Washington, DC, Donald J. Allison, Amherst, MA, for Defendant.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT* (Docket No. 89)

PONSOR, District Judge.

## I. *INTRODUCTION*

The plaintiff property owners have sued General Electric Company ("GE") for damages arising out of GE's disposal of fill dirt containing polychlorinated biphenyls (PCBs) on residential property in the Lakewood area of Pittsfield, Massachusetts. Count I of their complaint charges that GE's handling, disposal and release of the PCBs created a public and/or private nuisance; Counts II and III charge common law negligence and trespass. Count IV is a statutory claim under Mass. Gen. Laws ch. 21E § 2, the Massachusetts Oil and Hazardous Material Release Prevention Act, and the analogous federal statute, 42 U.S.C. § 9601, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

GE's motion for partial summary judgment is directed at a portion of the plaintiffs' common law claims, specifically:

(1) the nuisance, negligence and trespass claims of plaintiffs with contaminated, or previously contaminated, property;

(2) the nuisance, negligence and trespass claims founded on GE's remediation activities;

(3) the nuisance claims of plaintiffs who have no direct evidence of contamination; and

(4) plaintiff Cody's trespass and nuisance claims.

For the reasons set forth below, defendant's motion will be allowed in part.[1]

II. *PROCEDURAL BACKGROUND*

This case has had a somewhat contorted history. It began in 1998 as a claim by one plaintiff, Lewis, on behalf of herself and a purported class of property owners in the Lakewood section of Pittsfield, seeking damages arising from GE's disposal of PCBs in the area. The complaint claimed an entitlement to damages regardless of whether a class member's property had itself actually been contaminated. Lewis' property at that time had not been tested, and she was therefore unable to allege that her property actually contained PCBs.

In response to this early complaint, GE filed a motion to dismiss, arguing that no cause of action would lie unless actual contamination were alleged. This court allowed the motion as to all counts in the complaint at that time, except those for public and private nuisance. *Lewis v. Gen. Elec. Co.,* 37 F.Supp.2d 55 (D.Mass.1999).

On March 20, 2000, an amended complaint was filed, dropping the class action allegations and adding numerous new named plaintiffs. Nearly all these new plaintiffs (as well as Lewis, whose land by that time had been tested and found to contain PCBs) now sought damages based on actual contamination of their land. Since March 2000, this amended complaint has been further amended on two occasions to add or drop certain plaintiffs. The most recent amendment confirmed that Lewis, like all the other plaintiffs, is seeking damages under theories of negligence, trespass and statutory violation, as well as public and private nuisance.[2]

III. *FACTS*

The facts are described in the light most favorable to the non-moving parties.

The plaintiffs are (or were) owners of real estate in Pittsfield, Massachusetts.[3] For purposes of discussion they can be divided into two groups. The first group consists of thirty-nine plaintiffs whose property has been tested and determined to contain PCBs. Counsel have referred to this group as the "Contamination Plaintiffs." The second group comprises six plaintiffs who have not had their property tested and, hence, are not in a position, at this time, to allege that their property contains PCBs. This group has been designated the "No-Contamination Plaintiffs."

The Contamination Plaintiffs consist of two sub-groups: six who actually owned their property at the time of the alleged contamination, and thirty-three who bought their property after it had already been contaminated. As will be seen below, a plaintiff's membership in a particular group or sub-group will affect the analysis of the arguments concerning summary judgment.

1. The numerous parties and the complex issues raised by this motion have caused this normally prompt court to take longer than usual in issuing its ruling. The court very much regrets this delay.

2. GE's memorandum assumed that all claims for public nuisance dropped out of the litigation with the filing of the first amended complaint in March 2000. (Docket No. 91, at 4). Plaintiffs' memorandum, however, has confirmed that these claims are still in the case. (Docket No. 97, at 16).

3. Some of the plaintiffs are married couples or relatives who jointly own property. In their memoranda, counsel have referred to family groupings as one plaintiff. The court adopts this practice in its memorandum.

This summary will address, first, general background, then turn to facts specific to particular plaintiffs.

A. *General Background*

The alleged historical backdrop to this case highlights what appears from a contemporary perspective to be a shockingly cavalier attitude by GE, over many decades, towards the disposal of hazardous chemicals, and particularly the disposal of PCB-laden waste in the Lakewood area of Pittsfield.[4]

GE purchased its 250-acre Pittsfield, Massachusetts site in 1903 and used it for manufacturing and other purposes for many decades thereafter. Between 1932 and approximately 1977, GE used PCBs, a probable human carcinogen, in the manufacture of its electrical components. As a result, PCBs were deposited in and around the GE facility and into the Housatonic River. This court's opinion in *Church v. Gen. Elec. Co.*, 138 F.Supp.2d 169 (D.Mass. 2001), provides a more detailed overview of this chronology.

Over the course of time, waste deposits on the site became so substantial they threatened to overflow the available space. In 1946, therefore, GE informed its employees that it had fill that could be delivered to employees' residences for free if they were located within "economic hauling distance." (Docket No. 99, Exhibit 2, at 3). This practice of making free fill available to employees continued until the 1980's. For an entire generation of Pittsfield residents, GE's waste deposits were thus commonly used to fill in building lots and wetlands in the greater Pittsfield area, including the Lakewood area. The fill was hauled both by GE truck drivers and by non-GE contract truck drivers.

Evidence of record suggests that, once the program started, GE did little to supervise either what was used as fill or where it went. The defendant's indifference persisted over the decades despite knowledge that the fill contained trash and PCBs, and despite growing knowledge, and eventually virtual certainty, that PCBs were hazardous. Documents confirm that, at times, complaints about the quality of the fill (described as "paper, broken bottles, old rubbers and whatnot" (Docket No. 97, at 12)) jeopardized the whole program. Nevertheless, the practice continued, with no restrictions and with few, if any, records kept of what was going on. Many people appreciated the policy and took the fill eagerly. As one truck driver stated, "Everybody wanted it. Everybody wanted it. Get it for nothing—hell." (Docket No. 97, at 9 n. 8).

The evidence suggests that, even after GE knew, or should have known, that it had a legal obligation to disclose to regulatory agencies the history of its disposal of hazardous wastes, it covered up the practice, revealing it only as late as 1997.

The extensive contamination of residential areas of Pittsfield with PCB-saturated fill in time attracted the interest of state and federal environmental agencies. One of these was the Massachusetts Department of Environmental Protection ("DEP"), which promulgates regulations for oil and hazardous release prevention, and issues orders directing private entities to assess contamination levels and remove hazardous materials from private properties. Mass. Gen. Laws ch. 21E, §§ 3(a)-(b), 9.

In 1990 and 2000, GE entered into administrative consent orders ("ACO") with the DEP. These orders governed the in-

4. Defendant, of course, accepts these facts only for purposes of the current motion for summary judgment, reserving the right to contest them if the case goes to trial.

vestigation and remediation of residential as well as other properties. GE was obligated to conduct its activities according to the terms and conditions in the ACO's. In accordance with the 1990 order and the superceding 2000 order, GE tested and remediated hundreds of residential properties that were found to be contaminated by PCBs above a level of two parts per million (ppm), at the direction of the DEP.

If GE failed to comply with the ACO, the DEP had the power to assess penalties. GE has never been penalized for activity relating to the remediation of the residential fill properties. Furthermore, there is no evidence that the response actions taken by GE at the request of the DEP involved agency decisions that were arbitrary, capricious, or contrary to law.

The DEP interpreted the Massachusetts Contingency Plan, which governed the clean-up, to require remediation only on those properties where the *average* PCB concentration was more than 2 ppm based on a "spatial averaging" measurement methodology approved by the DEP. It is disputed whether GE has always removed contaminated soil merely to the point where the *average* level is 2 ppm or less, or whether it previously removed *all* areas of contaminated soil with PCB levels above 2 ppm, regardless of whether the average level for the whole area exceeded 2 ppm. GE contends that the former approach has always been its practice under both the 1990 and 2000 ACO's. (Docket No. 94, Exhibit 45, at ¶¶ 3–4). But plaintiffs insist that, under the 1990 ACO, GE removed all contaminated soil that exceeded 2 ppm, regardless of the average of the entire property. (Docket No. 100, Exhibits 26, 27 and 46, at 95–96). It is undisputed that GE's current practice is to remove soil only until the property-wide average is 2 ppm or lower.

Before GE commenced any investigation or remediation process, it provided the owner with the investigation plan or remedial action work plan, which contained a description of the investigative or remedial process. If remediation was necessary, GE and DEP representatives met with the homeowner to explain what they were going to do and to answer questions. GE also obtained an agreement from the owner permitting GE to enter the property for the purpose of doing the work specified in the agreement.

Some plaintiffs were not pleased with the scope of the plans presented to them and raised their dissatisfaction with the GE representatives. However, the plaintiffs were unable to effect significant change to the scope of the work GE proposed. All of GE's remediation activities were conducted within the scope of the plans reviewed by the homeowners, and with the approval of the DEP.

Despite agency oversight and prior review of the remediation plans by homeowners, the evidence suggests that the actual remediation work was a nightmarish experience for many families. Work at specific residences sometimes went on for months, with heavy equipment right outside the windows all day, soil dug up from one end of the property to the other (sometimes as far down as twelve feet), trees and shrubbery uprooted, and noise and dust flying in the air. Pets and children were forced to stay indoors, and some families found groups of people gathering to stare and watch the work. In at least one case a security guard was needed to keep vigil on the site after work hours, further invading the plaintiff's privacy. For some plaintiffs the entire character of the family home was destroyed, temporarily or permanently, by this siege-like process. While it was going on, many of the plaintiffs' lives were simply turned upside-down.

B. *The "Contamination Plaintiffs"—Larger Sub-Group*

With regard to the thirty-three plaintiffs in the "Contamination" group, whose property has been positively tested, but who purchased their land *after* GE abandoned the practice of supplying its employees free fill, it is undisputed that none of the plaintiffs received an assignment of any claim against GE from their predecessors in title. In each case, as noted, the PCB contamination was discovered only after the plaintiffs purchased their properties. It is undisputed that, since the contamination was unknown, the purchase prices paid by these plaintiffs for their properties were obviously calculated without taking contamination into consideration.

C. *The "Contamination Plaintiffs"—Smaller Sub-Group.*

As noted, six of the "Contamination Plaintiffs"—*i.e.,* the group whose land has been tested and found to contain PCBs—actually owned their land at the time GE had a general practice of making fill available to its employees. These plaintiffs have been designated as Aulisio, Fothergill, Mastrogiovanni, Stapleberg, Quadrozzi, and Roy. As to this sub-group, GE argues that the evidence of record is insufficient to justify any conclusion that GE-contaminated fill actually made it to these specific properties. In other words, GE contends that, even if the evidence (viewed in the light most favorable to the plaintiffs) might justify the conclusion that GE acted negligently as a *general* matter, these plaintiffs cannot show that GE's negligence actually damaged them specifically. This argument requires a careful look at the record as it bears on each of these properties.

The Aulisios purchased their property, located on Scalise Drive, in 1981, and they acquired fill for their land in 1982 and 1984. They purchased the first batch of fill from Dalton Sand & Gravel; it was mostly sand. In contrast, the fill that was acquired in 1984 was free. Mr. Aulisio's neighbor, who worked for Maxymillian Construction Company ("Maxymillian"), offered to have the fill delivered to the Aulisios. Mr. Aulisio observed that some fill was delivered to neighboring properties via trucks that belonged to Petricca Construction Company ("Petricca"). However, he was not at home when the fill was delivered to his own property. At the time of the deliveries, Maxymillian was working as a contractor for GE on a project involving the demolition of a building and the apparent excavation of a pond on GE's property. Mr. Aulisio believed that the fill had come from this site, located near the corner of Merrill Road and Plastics Avenue. His belief was confirmed in 1996 when he learned from a now deceased Petricca truck driver that the fill he received was excavated from the site of the pond. Both Maxymillian and Petricca were working on the latter project. When Mr. Aulisio acquired the fill in 1984, he noticed that it had "little black things and pieces of copper and porcelain in it." (Docket No. 102, Exhibit 1, at 11). After the contamination became public in 1997, Mr. Aulisio placed some of the debris in a bag and took it to GE. GE confirmed that the debris contained PCBs. *Id.* at 18–19.

The Fothergills purchased their property, located on Oak Hill Road, in 1978 from James Creran ("Creran"), a developer. The land was originally owned by Basil Petricca ("Mr.Petricca"), a GE contractor. When Mr. Petricca bought the land, it was very low and needed fill. Mr. Petricca and his company, Petricca Construction, filled in areas of Oak Hill Road from 1971, the year he acquired the land, until 1983. There is evidence from which a jury could conclude that this fill came from GE property. After the Fothergills bought their property in 1978, they acquired more fill

from the City of Pittsfield and from Creran. Mr. Fothergill had no knowledge of the source of the fill brought in by Creran. However, Creran had access to the fill that Petricca was depositing on many of the properties on Oak Hill Road.

The Mastrogiovannis purchased their Oak Hill Road property in 1976. Like the Fothergills, the Mastrogiovannis bought their home from Creran, who had in turn obtained the property from Petricca.

The Staplebergs bought their property, which is located on Naples Avenue, in 1951. In 1952, they purchased loads of fill from Vincent Stracuzzi ("Stracuzzi"), a local contractor who was known to do work for GE. At a later date, Stracuzzi's own commercial property on Newell Street was found to be contaminated and required remediation. Mr. Stapleberg had no idea where the contaminated fill on his property originated. However, the Staplebergs did notice that the fill contained debris and unusual objects, including insulators.

The Quadrozzis purchased their property, which is located on Brattle Street, in 1968. A house was subsequently built on the property by Marchetto, a general contractor. While their house was being built, the Quadrozzis had fill brought in. Mr. Quadrozzi did not believe that the fill originated from the GE facility. However, while he was a teenager in the 1950's, Mr. Quadrozzi observed GE trucks depositing fill on the Brattle Street road itself, which was a dirt road at the time. During the Quadrozzis' ownership, the road was graded, causing the dirt and fill to fall onto adjacent properties, including the property belonging to the Quadrozzis.

The Roys bought their property on Parkside Avenue in 1968. The next year, they had fill brought in by Del Virgilio ("Virgilio"), another local contractor who was known to do work for GE. Mrs. Roy had no knowledge of the source of the fill.

D. *The "No-Contamination Plaintiffs".*

These plaintiffs, who have not had their property tested and who therefore cannot offer evidence of PCB contamination, nevertheless contend that they have suffered a substantial interference with the use and enjoyment of their property. They insist that the close proximity of PCBs has substantially interfered with their peace of mind and their use and enjoyment of their property, and has caused their property value to diminish. These plaintiffs are Delmolino, Dixon, Dorr, Lewis, Lysobey, Nachbauer, Ostellino and Bellora. Because defendant seeks summary judgment as to all these plaintiffs, it is necessary to examine the record relating to these properties in some detail.

Plaintiff Delmolino does not reside at the property whose value has allegedly diminished. The house, which belonged to his now deceased mother, is currently owned by Delmolino and his brother. Delmolino did not change his activities on the land after learning of the PCB contamination on neighboring properties and the possibility that PCBs might be present on his own property. However, the close proximity of the PCB contamination has diminished his property value to half of what it was previously. Moreover, Delmolino and his brother have been unable to rent the apartment that was part of their duplex for over a year due to the nearby contamination and remediation activities. In addition, Delmolino's mother, while she was alive and owned the property, was very concerned about the testing and remediation activities on neighboring properties, which were disruptive and messy.

The Dixons, who are in their seventies, have tried unsuccessfully to get their property tested. Mr. Dixon does not know whether PCBs are present on his land, and

does not know whether fill was brought onto his property during the time that GE made fill available. Furthermore, the neighboring remediation was not a bother to him, and he has no idea of what the possible health risks were of being exposed to PCBs. However, not knowing whether PCBs were present on their property has been very upsetting to Mrs. Dixon. She found the nearby remediation activities to be disruptive; there were "lots of noisy trucks coming up and down [their] street frequently." The Dixon's property value has diminished due to the nearby PCB contamination.

The Dorrs did not change the manner in which they utilized their property despite their awareness of the ongoing remediation on neighboring properties. However, the value of their property diminished due to the nearby contamination and remediation activity. In addition, the sight of remediation crews in full body protective uniforms, particularly as they moved closer to the Door residence, distressed Mrs. Dorr.

Plaintiff Lewis was concerned about the health of her children. She became concerned about what they might put in their mouths while playing outside in their yard. She spoke to her family doctor, who informed her that as long as her children did not play in the dirt eight hours a day, they would be okay. After learning of the PCB problems in her section of Pittsfield, Mrs. Lewis decided to plant the family vegetables in a raised container rather than in the ground. She also tried for a year, unsuccessfully, to get her property tested by GE. Her situation differs slightly from the other plaintiffs in her sub-group, in that late in her ownership she did manage to get her property tested by GE. Levels of PCBs were discovered in the front lawn; however, no remediation was required. In the fall of 1999, the Lewis family sold their property. Their property value had diminished due to the PCB contamination and, as a result, the house sold for $20,000 less than its previous value.

Plaintiff Marilyn Lysobey ("Lysobey") lives across the street from Moldmaster, a commercial property with high levels of PCB concentration. Because of her close proximity to Moldmaster, she tried repeatedly to get her property tested by either GE, the DEP, or the EPA. Her property has not been tested to date. After learning of the PCB contamination nearby, Lysobey wore gloves while gardening. She also grew fewer fruits and vegetables and ate less of her produce than she had in the past. Other than gardening, Lysobey did very little work in her yard because she did not like the sun. The nearby contamination has also caused her property value to diminish.

Albert Nachbauer ("Nachbauer") does not reside at the property at issue. However, it was the home where he lived while growing up, and he and his wife became the owners of the property after Nachbauer's mother died. Up until a few years ago, Nachbauer maintained the yard at the property. He no longer does this, because his current tenant maintains the property in return for Nachbauer's foregoing rent. Nevertheless, Nachbauer would not hesitate to mow the lawn if the tenant were not living there. The possibility of PCB contamination on the property has caused Nachbauer significant concern. Because of the health risks, Nachbauer no longer feels that he can offer the house to one of his three adult children. Nachbauer's property value has also diminished due to the close proximity of PCB contamination.

Robert Ostellino ("Ostellino") sold his property in 1998 for $98,000. He believed that the house would have sold for $130,000 if there had been no PCB contamination, or perception of contamination, in the Lakewood area. Furthermore, Ron

Bellora ("Bellora"), Ostellino's brother-in-law, who took possession of the property to renovate and sell it, experienced significant difficulties in selling the property due to the contamination.

E. *Plaintiff Cody.*

This plaintiff occupies a unique position, since she does not allege that her property was damaged by contaminated fill. Rather, like the plaintiffs in the *Church* litigation, she claims that her property suffered contamination as a result of flooding from the Housatonic River. *See Church v. General Elec. Co.,* 138 F.Supp.2d 169 (D.Mass. 2001).

Plaintiff Irene Cody ("Cody") resides on Deming Street in Pittsfield, which runs parallel to the East Branch of the Housatonic River. There is a fifteen-foot strip of land between Cody's property and the Housatonic and the owner of the fifteen-foot strip has given Cody permission to use it if she wishes. Cody is a long time resident of Pittsfield and has some familiarity with the history of her property. Before 1966, there was a dam across the river that caused flooding on the land where Cody's house is presently located. Cody bought the land in the late 1960's, after the dam was removed. Before and after she built her house Cody had fill brought in by contractors. She did not believe that the fill was contaminated.

GE contends that Cody had reasonable notice as early as the 1960's of possible contamination of her property, because she knew that the river had previously flooded her land. GE argues, based on the *Church* decision, that the information readily available in Pittsfield long prior to 1997 was sufficient to place a person in Cody's position on notice that the Housatonic river was contaminated with PCBs from the GE facility. Cody's property was tested in 1995 and remediated in 1996. It was at this time that she actually confirmed that PCBs were present on her property. PCB-contaminated sediment has continued to emanate from the GE property into the Housatonic River. Cody maintains that the ongoing contamination is devaluing her property and interfering with her use and enjoyment. However, the record contains no evidence that the Housatonic has flooded Cody's property since 1997.

## *IV. DISCUSSION*

A. *Standard of Review*

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). District courts are obligated "to review the facts in a light most favorable to the non-moving party, drawing all inferences in the non-moving party's favor." *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 258 (1st Cir.1994), *citing LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993).

According to the Supreme Court, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies those facts that are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Furthermore, "the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B. *The "Contamination Plaintiffs".*

1. *The Larger Sub-Group.*

As noted above, of the thirty-nine plaintiffs who have confirmed the presence of PCBs on their property, only six acquired their property before the PCB-contaminated fill was deposited. GE argues that the remaining thirty-three plaintiffs cannot recover on their claims for nuisance, negligence and trespass, because the injury to their property occurred prior to their acquisition of title, and the claims based on this injury were never assigned to the current owners.

In *Larabee v. Potvin Lumber Company,* 390 Mass. 636, 459 N.E.2d 93 (1983), the Supreme Judicial Court found that the plaintiffs had "no valid claim in tort for injury to the property on the basis of a purchase and sale agreement." *Id.* at 96. The court added that recovery for an injury that took place prior to the acquisition of title must be based on an assignment of the claim. *Id.* at 96–97; *see also Harris v. J.C. Erb Constr., Inc.,* No. 954654, 1996 WL 1185038, at *2 (Mass.Super. Oct. 24, 1996) (finding that "[t]he only way that a purchaser can recover for an injury to property that occurred before he took title is if the vendor assigned him the right to sue."); *accord Koehn v. Ayers,* 26 F.Supp.2d 953 (S.D.Tex.1998) (finding that "Texas law bars purchasers of real property from asserting claims for property damage that occurred before the purchaser owned the property unless the deed expressly transfers the cause of action to the purchaser").

Defendant contends that the mere fact that the preexisting PCB contamination persists during the plaintiffs' ownership does not make the injury a new or continuous one. Rather, it is simply a "continuation of harm caused by previous but terminated tortious or unlawful conduct." *Carpenter v. Texaco, Inc.,* 419 Mass. 581, 646 N.E.2d 398, 399 (1995); *see also Taygeta Corp. v. Varian Assocs., Inc.,* 436 Mass. 217, 763 N.E.2d 1053, 1064–65 (2002).

In response, plaintiffs argue that their injury did not actually occur until after they took title to their properties. The prior owners had no cause of action and, hence, no claim to transfer. In support of their argument, plaintiffs insist that the court should apply some version of the "discovery rule," which is normally applicable to a statute of limitations defense, to the question of when the plaintiffs' causes of action accrued.

The discovery rule states that "regardless of the actual time of breach or injury, 'a cause of action does not accrue until a plaintiff discovers, or reasonably should have discovered, that she may have been injured as a result of the defendant's conduct.'" *Cambridge Plating Co., Inc. v. Napco, Inc.,* 991 F.2d 21, 25 (1st Cir.1993) (quoting *Hoult v. Hoult,* 792 F.Supp. 143, 144 (D.Mass.1992)). Under this rule, "[t]he statute of limitations does not run against a claim until 'an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury.'" *Bernier v. Upjohn Co.,* 144 F.3d 178, 180 (1st Cir. 1998), (quoting *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 557 N.E.2d 739, 741 (1990)); *see also Cabana v. Forcier,* 148 F.Supp.2d 110, 115 (D.Mass.2001) (citing *Bowen,* 557 N.E.2d at 742) (finding that under the

discovery rule, the statute of limitations does not begin to run until the plaintiff has knowledge or notice of the harm and knowledge or notice of the cause)). Whether the plaintiff was on notice of the accrual of a cause of action is ordinarily a question for the trier of fact. *Cambridge Plating,* 991 F.2d at 29, (citing *Riley v. Presnell,* 409 Mass. 239, 565 N.E.2d 780, 787 (1991); *see also Town of Sturbridge v. Mobil Corp.,* 195 F.Supp.2d 330, 335 (D.Mass.2002).

In the case before the court, it is undisputed that the contamination was not discovered until after the property was purchased by the plaintiffs. As a result, as noted in the factual summary, the plaintiffs obviously did not obtain the benefit of the reduced property value in the form of a lower sale price.

A closer look at the case law cited by defendant in support of its argument that the lack of an assignment bars the plaintiffs' claims reveals that all those cases involved situations in which the prior owners had actual knowledge of the injury before they sold the property. *See Larabee v. Potvin Lumber Co.,* 390 Mass. 636, 459 N.E.2d 93, 95 (1983) (finding that injury occurred before closing); *Harris v. J.C. Erb Constr., Inc.,* No. 954654, 1996 WL 1185038, at *3 (Mass.Super. Oct. 24, 1996) (finding that cause of action belonged to the prior owners where the injury occurred during the executory period of the real estate contract); *accord Koehn v. Ayers,* 26 F.Supp.2d 953, 957 (S.D.Tex.1998) (finding that cause of action belonged to prior owners where injury was open, obvious, known and consented to by the prior owners).

The plaintiffs now seeking damages from this court all purchased their property from previous owners who had absolutely no knowledge of the contamination on their property. Since these prior owners received full value at the time the plaintiffs made their purchases, they suffered no harm as a result of the undiscovered contamination. If the issue before the court involved the statute of limitations, it would be easy to conclude that these causes of action did not "accrue" while the previous owners held title to the property, since the prior owners did not know, and could not reasonably have known, of the existence of their injury. *See Allied Corp. v. Frola,* 730 F.Supp. 626, 632 (D.N.J.1990) (holding that "in an environmental contamination case, a cause of action accrues ... when a plaintiff knows or reasonably should know of his or her cause of action and of the identity of a party or parties who may be responsible for the injury.").

Defendant, of course, is not arguing that these lawsuits are untimely; strictly speaking, therefore, the statute of limitations argument is not pertinent. Rather, GE contends that the bulk of the plaintiffs simply have no cause of action. Any claim was possessed by the prior owner and never handed on to the plaintiffs.

GE's argument is ultimately unpersuasive, for two reasons.

First, the notion that a claim for damages can only be asserted by a party who is unaware that he has been damaged is an offense to basic fairness and common sense. The previous owners had no knowledge of the insidious damage to their property and passed the secret injury on to the plaintiffs, who (the court must assume for purposes of this motion) have suffered severe financial and other injuries as a result. As the defendant frames the issue, a tortfeasor in these circumstances could escape liability by the happenstance of a property sale. No authority justifies such an unjust result. Defendant's argument that the "discovery rule" relates only to the statute of limitations, and is irrelevant to the question whether the plaintiffs actually possess a cause of action, misses the underlying policy that supports the

discovery rule, which is (in essence) that hidden injuries become actionable only when the injured party knows, or reasonably should know, of the injury. That logic is clearly applicable here and controls the decision.

Second, this case has the peculiar feature that, to some extent, *knowledge* of the injury is part and parcel of the injury itself. Prior owners, being ignorant of the damage to their property, suffered no emotional distress or other disturbance from it, and were able to pass on their properties for full value with a clear conscience. Disclosure of the contamination at a later date caused distress and anxiety in the current owners and at the same time made it impossible for them to receive full value in the event of a sale. Thus, knowledge of the injury *was* the injury, to some extent. It is axiomatic that "[a] negligence action may not be maintained unless one has suffered injury or damage." *Cannon v. Sears, Roebuck, & Co.*, 374 Mass. 739, 374 N.E.2d 582, 584 (1978) (finding, in the statute of limitations context, that a cause of action accrues at time of injury, because such a rule "remedies the injustice and illogic of barring the plaintiff's suit before the cause of action exists"). Here, without knowledge there was no damage.

Both the particular nature of the injury here, and fundamental fairness, require that defendant's motion be denied on Counts I, II and III, with respect to the thirty-three plaintiffs who acquired their properties after the PCB contamination.

2. *The "Contamination Plaintiffs"—Smaller Sub-Group*

Defendant next argues that the six plaintiffs who bought their land prior to the contamination have insufficient evidence linking the presence of contaminated fill on their particular properties to any negligence on GE's part. In other words, GE says that, without rank speculation and conjecture, no jury could find GE responsible for the presence of PCBs on these six properties.

Although this argument has force, the court disagrees. Rather powerful circumstantial evidence, when combined with evidentiary details specific to each plaintiff (summarized above), is sufficient to entitle the plaintiffs to jury consideration of the issue of actual contamination.

GE must concede that the record contains ample evidence of its extensive disposal of PCB-laden fill in the particular areas where plaintiffs have lived or are now living. It must further concede that GE's "free fill" program was in operation at the time these plaintiffs contend that the contamination of their properties occurred. The time and place fit. Moreover, in many cases the contractors used for the dumping, the locations where the fill came from and/or the physical qualities of the fill itself, all denote a connection to GE. Jurors may not be persuaded, but there is enough evidence here to give plaintiffs the right to try to persuade them.[5]

3. *Claims for Damages Arising From Remediation Itself.*

Defendant argues that none of the Contamination Plaintiffs, regardless of subgroup, is entitled to seek damages to compensate for the inconvenience, distress and disruption caused by GE's remediation activities. GE points out that parties engaged in remedial activities directed at

5. In its memorandum in support of the motion for summary judgment, GE has not broken its arguments down among the claims for trespass, negligence, and private/public nuisance. Its one argument has applied to all. In evaluating the record the court has therefore assumed that a sufficiency of evidence for one count would be a sufficiency for all three.

protecting public health may not be sued for these activities. *Nassr v. Commonwealth*, 394 Mass. 767, 477 N.E.2d 987, 990 (1985). This protection against suit is especially strict when, as here, the putative defendant was acting at the direction and under the supervision of the public authority. *Hub Theatres, Inc. v. Mass. Port Auth.*, 370 Mass. 153, 346 N.E.2d 371, 373 (1976). Chapter 21E itself limits judicial action "concerning the adequacy or reasonableness of any response action" to situations where the state agency's decision to take action was "arbitrary and capricious or otherwise not in accordance with law." Mass. Gen. Laws Ch. 21E, § 5B. No evidence of any "arbitrary or capricious" decision-making exists on this record. Finally, and in addition to the above arguments, GE reminds the court that all the plaintiffs reviewed and agreed to the remediation plans for their properties.

■ The defendant's argument is correct, up to a point. Plaintiffs will not be permitted to claim that the manner or extent of the remediation activities resulted in compensable injury. However, they will be allowed to argue to the jury that the inconvenience and distress they suffered as a result of the remediation was part of the damage foreseeably flowing from the original contamination. In other words, even assuming the remediation was managed perfectly, and was entirely proper in scope and manner, a jury might reasonably find that the damage and distress inevitably caused by the clean-up, no matter how competently it was performed, was proximately caused by the original negligence and, as such, compensable. The fact that the property owners consented to the clean-up does not alter this conclusion, since they consented in order to obtain remediation of an injury they should never have suffered in the first place.

An analogy offered by the plaintiffs will serve to bring the issue into focus. The Supreme Court has observed that a firefighter who enters on premises to put out a blaze cannot be sued by the owners for depriving them of the use of the property. *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 93, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969). This truism, however, will not shelter the arsonist who sets the blaze from a full claim for damages, covering both injuries caused directly by the fire and by the firefighters trying to quell it. Similarly, the fact that GE performed the role of the firefighter in this drama will not shelter it from any claim for damages growing out of its earlier activities in the guise of the analogous arsonist. Thus, the present motion for summary judgment will be denied to the extent that injuries suffered from remediation are causally linked to the original contamination, and not based upon negligence in the conduct of the remediation itself.[6]

4. *The "No Contamination" Plaintiffs.*

■ GE's arguments regarding the claims of the plaintiffs who cannot, as yet, offer evidence of any contamination of their properties (or at least no average PCB contamination above a level of 2 ppm)

6. The distinction between a claim for damages based on mismanagement of the remediation (which will not lie), and a claim for damages flowing from the need for the remediation in the first place (which will lie) probably means that defendant will be entitled to judgment regarding this aspect of the plaintiffs' damage claim on all counts in the complaint except Count II, which charges negligence. The absence of any "arbitrary or capricious" conduct certainly appears to doom any claim on this theory under Count IV, which charges a violation of Chapter 21 E. The application of the court's ruling to individual counts, other than Chapter 21 E, has not been briefed, however, and may be fine-tuned as trial approaches.

have already been addressed by the discussion above, or by the court's prior decision, *Lewis v. Gen. Elec. Co.,* 37 F. Supp 2d 55 (D.Mass.1999) ("*Lewis I*"). For the reasons set forth in *Lewis I,* defendant is entitled to summary judgment on the claims for negligence, trespass and violation of Chapter 21 E. Claims for diminution of property value and for emotional distress will lie, however, under theories of public or private nuisance, even where no physical contamination of the property has occurred. Thus, the motion directed at the "No Contamination" plaintiffs will be denied as to Count I. As the Supreme Judicial Court has noted, a party may be enjoined under a nuisance theory:

> . . . from making use of land owned or controlled by it in a way which is offensive to persons of ordinary sensibilities occupying neighboring property, or which unreasonably diminishes the value of property owned by others.

*Lenari v. Town of Kingston,* 348 Mass. 355, 203 N.E.2d 808, 810 (1965) (citing *Swensen v. Marino,* 306 Mass. 582, 29 N.E.2d 15, 18 (1940)). Although decisions have gone in various directions regarding common law nuisance claims for diminution in property value caused by nearby contamination, the stronger strand of jurisprudence favors recognizing such claims. *See, e.g., Scheg v. Agway,* 229 A.D.2d 963, 645 N.Y.S.2d 687, 688 (N.Y.App.Div.1996) (finding that complaint stated a cause of action for nuisance where plaintiffs alleged that "the value of their property was diminished as a result of its proximity to a landfill"); *see also MHE Assocs. v. United Musical Instruments,* No. 1:93CV1883, 1995 WL 1051651, at *4 (N.D.Ohio Mar. 24, 1995) (finding that, under Ohio law, plaintiffs could maintain a nuisance claim for the loss of property value due to public perception if the interference was unreasonable and substantial); *Allen v. Uni–First Corp.,* 151 Vt. 229, 558 A.2d 961 (1988) (finding that the trial court erred when it prevented the jury from properly considering the plaintiffs' claims that their property values had decreased due to "widespread contamination and the resulting public perception that [their town] was an unsafe place in which to live"); *DeSario v. Ind. Excess Landfill, Inc.,* 68 Ohio App.3d 117, 587 N.E.2d 454, 461 (1991) (finding that, under Ohio law, plaintiffs are not required to show a physical intrusion on to their land to recover under a private nuisance theory, rather "a class action may be premised on the public's perception of contamination irrespective of actual land contamination"); *Acadian Heritage Realty, Inc. v. City of Lafayette,* 446 So.2d 375, 379 (La.Ct.App. 1984) (finding that "damages resulting from the 'stigma' attached to [the mere existence of a] landfill may be recovered").

In sum, defendant's motion for summary judgment regarding the "No Contamination" plaintiffs will be allowed, except as to Count I.

5. *Plaintiff Cody.*

As noted above, plaintiff Cody is a somewhat anomalous party to this litigation. She does not claim damages resulting from contaminated fill, as do all other plaintiffs, but rather from PCB-contaminated overflow coming onto her property during floods of the Housatonic River. In 1995, a group of plaintiffs filed a complaint making precisely this claim, and in 1997 this court allowed GE's motion for summary judgment, based on the statute of limitations, as to all counts in this complaint except one. *See Church v. Gen. Elec.,* C.A. No. 95–30139–MAP, 1997 WL 129381 (D.Mass. Mar. 20, 1997).

■ In its 1997 *Church* decision, the court enforced the three-year statute of limitations applicable to the plaintiffs' claims, noting the "blizzard of information and discussion about PCB contamination

in the Housatonic for decades prior to the filing of [the] lawsuit." *Id.* at *5. This easily obtained information, the court found, would have put any reasonable plaintiff on notice of a potential claim much more than three years prior to the filing of the lawsuit.

The same holding applies here, only with even more force. The plaintiff Cody's access to generally available information was enhanced by her specific, actual information about the contamination of her land from Housatonic flooding decades prior to her lawsuit. Moreover, her land was remediated by the defendant in 1995–96, more than three years before she joined this lawsuit in March 2000.

Cody's lawsuit is not rescued by the preservation of the one viable count in *Church.* The court's March 1997 ruling did deny GE's motion with regard to any claims for nuisance or trespass based on a "continuing tort." Citing *Carpenter v. Texaco,* 419 Mass. 581, 646 N.E.2d 398 (1995), the court held that plaintiffs might recover if they could show (1) continued harmful deposits onto their properties and (2) recurring tortious conduct by GE within the limitations period that caused the deposits. *See Church v. Gen. Elec.,* 138 F.Supp.2d 169, 177 (D.Mass.2001). More recently, the SJC has underlined the viability of this sort of claim. *See Taygeta v. Varian Associates,* 436 Mass. 217, 763 N.E.2d 1053, 1065 (2002) (claim will exist where presence of hazardous material is "an ongoing source of groundwater contamination that continues to flow unabated onto the site").

Here, unfortunately for plaintiff, the undisputed facts confirm that the Cody land has not been flooded since well before 1997. Thus, even if some recurring tortious conduct could be shown, the record is devoid of evidence of any contamination by GE during the limitations period.[7] Defendant's motion for summary judgment will therefore be allowed as to this claim.

## V. *CONCLUSION*

For the reasons set forth above, defendant's Motion for Partial Summary Judgment is hereby ALLOWED, regarding the "Contamination Plaintiffs," with respect to any Nuisance, Negligence and Trespass claims for the *manner* in which the remedial activity was conducted. The motion is ALLOWED as to the "No Contamination Plaintiffs" with respect to all claims except the nuisance count. The motion is also ALLOWED with respect to plaintiff Cody's nuisance and trespass claims. In all other respects, the motion is hereby DENIED. Defendant will file an answer to plaintiffs' Fourth Amended Complaint (Docket No. 105) within thirty days. The clerk will set the case for a status conference.

A separate order will issue.

## *ORDER*

For the reasons stated in the accompanying Memorandum, defendant's Motion for Partial Summary Judgment is hereby ALLOWED, regarding the "Contamination Plaintiffs," with respect to any Nuisance, Negligence and Trespass claims for the *manner* in which the remedial activity was conducted. The motion is ALLOWED as to the "No Contamination Plaintiffs" with respect to all claims except the nuisance count. The motion is also ALLOWED with respect to plaintiff Cody's nuisance and trespass claims. In all other respects, the motion is hereby

7. The fact that plaintiff has informal permission to use a fifteen-foot wide strip of land nearer the river, which belongs to another individual, does not strengthen her position. If this sort of entitlement provided a basis for suit, there would be no end to the number of potential plaintiffs who might claim damage.

DENIED. Defendant will file an answer to plaintiffs' Fourth Amended Complaint within thirty days. The clerk will set the case for a status conference.

It is So Ordered.